## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC. | § | Case No. 09-39313 |
| et al. | § | |
| | § | Jointly Administered Chapter 11 |
| | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF | § | |
| UNSECURED CREDITORS | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Adversary No. 10-3116 |
| | § | |
| FLI DEEP MARINE LLC, BRESSNER | § | |
| PARTNERS, LTD., LOGAN | § | |
| LANGBERG, HARLEY LANGBERG, | § | |
| and DEEPWORK, INC. | § | |
| | § | |
| Defendants. | | |

### OPPOSITION OF DEFENDANTS FLI DEEP MARINE LLC, BRESSNER
### PARTNERS, LTD., LOGAN LANGBERG AND HARLEY LANGBERG
### TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

(DOCKET NO. 26)

Dated: May 24, 2010

PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100

Attorneys for Defendants

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................4

FACTUAL BACKGROUND .................................................................4

ARGUMENT ....................................................................................8

   I. Standard for Summary Judgment ...............................................8

   II. The Creditors Committee Is Not Entitled To Summary Judgment ..................8

      A. Section 510(b)...............................................................9

      B. The Defendants Are Considered "Creditors" Under the Bankruptcy
      Code...........................................................................10

      C. A Short Form Merger is Not a Sale of Stock......................................11

      D. Even If a Short Form Merger Is a Sale of Stock, the Delaware Claims Do
      Not Seek to Rescind The Merger...........................................14

      E. SeaQuest Diving Does Not Control This Case.....................................15

      F. Public Policy Does Not Support Subordination in This Case...................18

   CONCLUSION.....................................................................................20

Cases

7547 Corp. v. Parker & Parsley Development Partners, L.P.,
   38 F.3d 211 (5th Cir. 1994) ...................................................................... 12
Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ................................................................................. 8
In re Angeles Corp.,
   177 B.R. 920(Bankr. C.D. Cal. 1995)........................................................ 18
In re Audre, Inc.,
   210 B.R. 360 (Bkrtcy. S.D. Cal. 1997)......................................10, 13, 15, 18
In re Seaquest Diving, LP,
   579 F.3d 411 (5th Cir. 2009) ............................................................ 15, 19
In re Wyeth Co.,
   134 B.R. 920 (Bankr. W.D. Mo. 1991) ....................................................... 19
Jacobson v. AEG Capital Corp.,
   50 F.3d 1493 (9th Cir. 1995) ................................................................... 12
Jeanes v. Henderson,
   703 F.2d 855 (5th Cir. 1983) ................................................................... 13
Ramirez v. City of San Antonio,
   312 F.3d 178 (5th Cir. 2002) ..................................................................... 8
Vine v. Beneficial Finance Co.,
   374 F.2d 627.................................................................................... 12, 13

Statutes

11 U.S.C.A. § 101(5) ................................................................................. 11
11 U.S.C.A. § 510 ..................................................................................... 10
11 U.S.C.A. §101(10)................................................................................. 10

Rules

Fed. R. Civ. P. 56(c)................................................................................... 8
Federal Rule of Civil Procedure 56................................................................. 4
Federal Rules of Bankruptcy Procedure 9013 ................................................. 4

Defendants FLI DEEP MARINE LLC, BRESSNER PARTNERS LTD., LOGAN LANGBERG, and HARLEY LANGBERG (collectively, the "Defendants"), file this Opposition to the Official Committee of Unsecured Creditors' (the "Committee") Motion for Summary Judgment, pursuant to Federal Rules of Bankruptcy Procedure 9013, 7056, and Federal Rule of Civil Procedure 56 (the "Motion"), and state as follows:

## Preliminary Statement

The Committee's Complaint and Motion for Summary Judgment are both premised upon the inaccurate assertion that that the lawsuit initiated by the Defendants in Delaware (the "Delaware Action") seeks damages related to the "purchase or sale of securities in the Debtors". This premise is flawed. Defendants never sold their shares in the Debtors and therefore cannot be suing for damages related to the purchase or sale of securities. The Defendants had their Deep Marine Holdings, Inc. (together with Deep Marine Technology Incorporated, "DMT") stock stripped from them in a squeeze-out merger, but the Defendants do not seek to rescind that merger, nor does the Defendants' Delaware complaint attack the merger itself. The Defendants only seek compensation for the wrongdoing committed by the Debtors, the Debtors' controlling shareholders, and certain of the Debtors' former officers and directors.

## Factual Background

Defendants were minority shareholders of the Debtors. In October 2008, the Defendants sent to the Debtors' board a demand letter, outlining

allegations of wrongdoing against the Debtors, their controlling shareholders, and their then-current and former officers and directors. DMT appointed a purportedly independent special committee to investigate the Defendants' allegations.  Soon afterward, the Defendants filed a derivative suit in Delaware Chancery Court, asserting that the Defendants' demands on DMT were futile because, among other reasons, the Special Committee was made up of the two remaining Board members of DMT and was therefore anything but independent.  The Defendants' initial complaint in the Delaware case was ultimately dismissed without prejudice by the Delaware Chancery Court in order to give DMT's Special Committee an opportunity to investigate the Defendants' allegations.  The Chancery Court anticipated that the Defendants would have an opportunity to challenge the Special Committee's findings once the investigation was complete.  For more than eight months, the Special Committee purportedly investigated Defendants' claims.

On June 30, 2009, the Special Committee issued a press release announcing that its investigation had concluded.  But the Special Committee refused to send or even show its report to the Defendants.  The very next day, July 1, 2009, DMT announced that it had consummated a short form merger (the "Merger").  Under Delaware law, a shareholder vote was not required to consummate a short form merger, so without any choice in the matter or further procedure, the Defendants' shares in the Debtor were confiscated by the majority shareholders.  Defendants' only choice was whether to accept $0.01 per share – the purported "fair value" offered by the Debtors – for a company that just one

year earlier had been valued at $100 million, or to seek appraisal rights for their confiscated shares under Delaware law.[1]

On October 26, 2009, the Defendants filed a new complaint in Delaware Chancery Court, asking that court to appraise the Defendants' confiscated shares, and asserting direct claims against DMT and its controlling shareholders and former directors and officers.  The Delaware claims filed on October 26 – which are the claims that are currently stayed and the claims referred to by the Committee in its Motion – seek, *inter alia*, statutory appraisal rights for the shares confiscated in the Merger, as well as the direct tort claims against certain current and former officers, directors and controlling shareholders of the debtor.[2]  A copy of the complaint in the Delaware case is annexed hereto as <u>Exhibit A</u>.

Each of the Defendants has filed claims in this Court asserting damages against the Debtor as a result of those causes of action asserted by the Defendants against the Debtors in the Delaware case.[3]

---

[1] The Defendants sought appraisal rights for their shares but the Debtors filed for bankruptcy before that process got very far.  As a result, the Defendants had their shares taken, but never received any compensation.

[2] In addition to the exercise of the Defendants' statutory appraisal rights for the shares stripped from them in the Merger, the Defendants' Delaware complaint also asserts direct causes of action for breaches of fiduciary duties by DMT's former officers, directors, and controlling shareholders; aiding and abetting the breaches of fiduciary duty; unjust enrichment of DMT's controlling shareholders; fraud; wrongful equity dilution; and an accounting of DMT.

[3] Because the issue of ownership of the claims has yet to be decided, the Claims include all causes of action asserted in Delaware.  The Defendants will seek to amend their proofs of claim if and when appropriate.

At no time did the Defendants sell their DMT shares, nor do the allegations in the Delaware case arise from the sale of any DMT security.

## ARGUMENT

### I.  Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one which could have an impact on the outcome of the lawsuit, while a genuine issue of such a material fact exists if a rational jury could find in favor of the non moving party, based upon the evidence presented.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).  Therefore, in the event there is a genuine issue of material fact, or the moving party is not clearly entitled to a judgment as a matter of law, summary judgment is inappropriate.  Any inferences drawn from the evidence in the record must be done in a light most favorable to the non-moving party. Ramirez v. City of San Antonio, 312 F.3d 178, 181 (5th Cir. 2002)

### II.  The Creditors Committee Is Not Entitled To Summary Judgment

In this case, there are significant and genuine issues as to the facts that are most material.  The Committee bases its claim for subordination on the assertion that the Defendants' Delaware causes of action are for rescission of a stock sale.  However, the Defendants never "sold" their stock and therefore cannot be suing the Debtors for rescission of a sale.  In addition, even if somehow shares confiscated in a short form merger could be construed to be a sale of stock, the

core of the Defendants' claims in the Delaware case relate to events that occurred in the years before the Merger.  Contrary to the assertions of the Committee, the entirety of the Defendants' claims do not arise from the Merger or any other purchase or sale of securities.[4]  Given the significant and genuine issues that exist, the Committee is not entitled to summary judgment.

Furthermore, as this Court is aware, the Delaware claims are the subject of Adversary Proceeding No. 10-3026 in which the Debtors seek the issuance of an order enjoining the prosecution of the Delaware claims.  This Court has yet to rule regarding the direct versus derivative nature of the claims asserted in the Delaware Complaint.  At present, a bona fide dispute exists as to the ownership of the causes of action raised in the Delaware claims.

A.    Section 510(b)

The Bankruptcy Code provides that claims for damages related to the purchase or sale of a security must be subordinated to the claims of unsecured creditors.  Specifically, §510(b) provides as follows:

---

[4] For most of the Committee's Motion, it appears that the Committee is asserting that the Merger was the "sale of securities" that should trigger the subordination provisions of the Bankruptcy Code. In some places, however, it appears that the Committee is asserting that it was the initial purchase of DMT securities in 2002 that triggered the subordination the Committee seeks. See Motion for Summary Judgment at 6 -7.  The latter assertion holds as little water as the former. The Defendants have never indicated that they seek rescission of their original 2002 investment in DMT.  Furthermore, if the Court were to adopt the Committee's argument, the logical result would be that any claim filed by a shareholder or former shareholder that related in any way to that shareholder's ownership of the debtor's security – even a tort that was wholly unrelated to the purchase of shares or the shares themselves but that was committed while the shareholder owned shares – would be subordinated, because if a claim was related to the shareholder's ownership of the shares, it would also necessarily relate to that shareholder's initial purchase of the shares.  This is clearly not the outcome anticipated by the SeaQuest court.

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal to the claim or interest in the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C.A. § 510.   The Defendants agree with the Committee that §510(b) requires that "a claim arising from rescission of a purchase or sale of a security of the debtor . . . [or] for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal to the claim . . . represented by such security."

But "tortious conduct independent of the purchase and sale of the securities . . . is beyond the application of § 510(b)." In re Audre, Inc., 210 B.R. 360, 363 (Bkrtcy. S.D. Cal. 1997).   The tortious conduct of the Debtors, their controlling shareholders, and their former officers and directors is the basis for the Defendants' claims in Delaware.   The Defendants' claims do not, however, have anything to do with the purchase or sale of securities, and therefore §510(b) is inapplicable and irrelevant.

## B.   The Defendants Are Considered "Creditors" Under the Bankruptcy Code

Pursuant to §101(10) of the Bankruptcy Code, the term "creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C.A. §101(10).

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" 11 U.S.C.A. § 101(5).   Using these definitions, it is clear that the Defendants are creditors of the Debtors and have claims with regard to the Debtors' assets.

###### C.    A Short Form Merger is Not a Sale of Stock

There is no support offered by the Committee for its naked assertion that the Defendants "sold" their DMT shares in the Merger.   The Committee just states its assertions as fact, and then concludes that because the shares were sold, and the Delaware claims relate to those sales, the Defendants' claims should be subordinated.   But the Defendants did not sell their shares and in any event, the bulk of the Defendants' claims do not relate to the Merger (i.e., the "sale" according to the Committee) but to the tortious actions of the Debtors, their controlling shareholders, and their current and former officers and directors in the years leading up to the Merger.

It is undisputed that the Defendants' shares in the Debtors were "transferred" to the Debtors in the course of the Merger that was consummated on June 1, 2009.   The only question is whether that transaction was considered a "sale" of the Defendants' shares.

While there seem to be no cases directly on point, the courts' need to create a "forced seller doctrine" in a different short form merger context

demonstrates that short form mergers are <u>not</u> sales.  When a plaintiff sues for securities law violations under Rule 10b-5 of the Securities Act of 1933, "the plaintiff must be an actual 'purchaser' or 'seller' of securities who has been injured by deception or fraud 'in connection with' the purchase or sale." <u>7547 Corp. v. Parker & Parsley Development Partners, L.P.</u>, 38 F.3d 211, 226 (5th Cir. 1994). This creates a problem for a class of potential plaintiffs who are injured by deception or fraud in a transaction in which their shares are taken from them, but where the transaction in which they lost their shares – such as, for example, a short form merger – was not actually a "sale" of securities. <u>Id.</u>  Prior to a 1967 Second Circuit decision, in such cases the defendants would (often successfully) argue that the plaintiffs had no standing to sue because the plaintiffs were not sellers, as required by Rule 10b-5.

        In response to this situation, the federal courts propagated a legal fiction called the "forced seller doctrine" to protect defrauded shareholders.  The forced seller doctrine "is a narrow exception which provides a cause of action to shareholders who, without any say, find themselves fraudulently forced-out of their securities." <u>Jacobson v. AEG Capital Corp.</u>, 50 F.3d 1493, 1499 (9th Cir. 1995). It was the Second Circuit that created the "forced seller doctrine" in <u>Vine v. Beneficial Finance Co.</u>, 374 F.2d 627 (2d Cir.), <em>cert. denied,</em> 389 U.S. 970, 88 (1967).  "[T]he Second Circuit held that a minority shareholder, faced with the choice of either holding stock in a nonexistent corporation or exchanging his shares for value following a short form merger, was a seller for purposes of 10b-

12

standing," even if he was not an actual seller. Jeanes v. Henderson, 703 F.2d 855, 860 (5th Cir. 1983). See also Vine, 374 F.2d at 635.  Clearly the court would have felt no need to create the "forced seller" doctrine if the confiscation of shares in a short form merger was, in fact, a sale.

The public policy considerations behind the "forced seller" doctrine recognize that although the squeezed out minority shareholders in a short form merger are not, in fact, sellers, if they were actually defrauded it would be unjust to deny them a forum to seek redress of their grievances.  Similar public policy considerations would dictate that the defrauded Defendants in this case, even if considered "forced sellers," not be forced into the language of a statute which requires actual sellers.

In re Audre, Inc., 210 B.R. 360, from the Ninth Circuit, is particularly instructive.  In that case, a shareholder sued for fraud in connection with a short form merger.   The debtor sued for subordination of the shareholder's claims pursuant to § 510(c) [equitable subordination] of the Bankruptcy Code.  According to the Court, the debtor had acknowledged that the nature of the claims [i.e., fraud in connection with a short form merger] meant that the claims were not subject to mandatory subordination under § 510(b) because the claims were not related to a purchase or sale of securities.  Id. at 368.

> If Congress intended that any claim which derived from a creditor's equity interest be subordinated to trade creditors because of the respective nature of their claims, the Congress knew how to write for such a result. Instead, the Congress chose to more narrowly define the claims subject to mandatory subordination, and the plaintiffs acknowledge that the claims at

> issue are not subject to mandatory subordination under §
> 510(b) because of the nature of those claims.

Id. The court denied the debtor's motion for summary judgment, holding that the debtor was not entitled to subordination of the shareholder's claim because the claimed fraud and damages did not arise from the purchase or sale of securities.

In this case, the Defendants did not sell their stock, and their claims did not "aris[e] from rescission of a purchase or sale of a security of the debtor."

### D.   Even If a Short Form Merger Is a Sale of Stock, the Delaware Claims Do Not Seek to Rescind The Merger

Even if this Court was to determine that DMT stock taken from the Defendants in the Merger was a sale of stock by the Defendants, summary judgment is still inappropriate because the Defendants' Delaware claims – aside from the appraisal claims – do not relate to the Merger but to numerous events that occurred in the years leading up to the Merger.

The Committee asserts that "[t]he sale of Defendants' minority shares for less than $10,000 is the basis of the Delaware Lawsuits." (Motion for Summary Judgment at ¶ 16)  It is true that the appraisal claims – which seek fair value for the shares taken from the Defendants in the Merger, as mandated by Delaware law – relate to the Merger.   But the remainder of the Defendants' claims are not focused on "the sale of Defendants' minority shares for less than $10,000."  In the Delaware complaint, the Defendants neither attack the Merger itself, nor do they seek to rescind the Merger.  The claims relate to the tortious (mis)conduct of the Debtors, their controlling shareholders, and their former board members in the

years leading up to the Merger.  It does not change the analysis that the damages sought by the Defendants may be based on their former equity interest in the Debtors.  "The fact that the alleged damages are equal to what the equity interest would have been is not determinative."  In re Audre, 210 B.R. at 369.

E.     SeaQuest Diving Does Not Control This Case

The Committee repeatedly refers to the SeaQuest Diving case in support of its assertions.  But the Committee's reliance on SeaQuest is misplaced.

SeaQuest Diving LP v. S & J Diving Inc., 579 F.3d 411 (5th Cir. 2009) dealt with an appeal from the decision of the bankruptcy court to subordinate a creditor's (and former shareholder's) claims because the claims were based on the rescission of certain agreements and obligations related to the acquisition of securities.  But compared to the case presently before the Court, the issues in SeaQuest were largely semantic.  The facts in SeaQuest clearly show that there was indisputably rescission of an equity investment and that the bankruptcy claim was related to a state court judgment enforcing that rescission.  The only question for the court was whether that rescission was the basis for the bankruptcy claim, or whether the state court judgment was the basis for the claim.  In the end, the court held that it did not matter, because the court could "look behind" the state court judgment to the rescission itself.  As a result, the claim arose from the rescission of a purchase or sale of a security of the debtor no matter the basis for the claim.  This is clearly a very different fact pattern that the one before this

Court.  In this case, it is not clear at all that there was even a sale of a security, let alone whether that sale was the basis for any or all the Defendants' claims.

The Committee repeatedly asserts that SeaQuest had something to do with a derivative claim.  For example, while citing to SeaQuest, the Committee asserts that "the Fifth Circuit has held subordination under Section 510(b) extends beyond claims based on fraud in the issuance of securities and extends to derivative claims." (Motion for Summary Judgment at ¶ 26).  Putting aside for a moment that the Defendants have not asserted derivative claims against the Debtors[5], SeaQuest does not at all discuss derivative claims.  In fact, the word "derivative" does not appear even once in the SeaQuest decision.

In fact, none of the cases cited by the Committee address the specific facts of this case.  The cases cited by the Committee include claims arising from breach of a stock provision, failure to exchange stock, fraudulent retention of stock and fraudulent inducement to purchase stock.  None of the authorities cited by the Committee address the issues raised by a short form merger.

Finally, the Committee misrepresents the Defendants' claims.  The Committee attributes to the Defendants the argument that the Defendants dispute the merger notice because

---

[5] Although the Committee repeatedly asserts that the Defendants' Delaware lawsuit is a "derivative lawsuit," the Delaware case is actually not captioned as such, nor is it in fact a derivative suit.  The Defendants had previously filed a derivative lawsuit on behalf of DMT, but were forced to abandon that approach when they were stripped of their shares and lost their standing.  The "forced seller doctrine" only applies in federal court.  There is no comparable provision in Delaware law.

> the notice omitted material information such that Defendants
> could not determine whether to <u>accept the merger</u> or seek
> appraisal rights . . . Defendants' assertion that their voting
> rights were abrogated or that some misrepresentation <u>barred</u>
> <u>them from making an educated decision when voting on the</u>
> <u>merger</u> is a remedy reserved for equity investors

(Motion for Summary Judgment at ¶ 32).  The Committee's gross
misrepresentation of the Defendants' claims shows that the Committee does not
understand the Defendants' claims or the nature of a short form merger, both of
which are essential to the Committee's Motion.

In a short form merger under Delaware law, a shareholder that owns
90% or more of the equity of a company may consummate a short form merger
which allows the majority shareholder to squeeze out the minority shareholders in
exchange for compensation in the form of the fair value of the squeezed out
shares.  The key feature of the short form merger, the feature that distinguishes it
from a normal-course merger, is the fact that <u>the minority shareholders are not</u>
<u>entitled to vote on the merger</u>.  The Defendants' claims cannot be – and, in fact,
even a cursory reading of the Defendants' Delaware complaint shows that they are
not – related to whether or not the Defendants had enough information with which
to cast their vote on the Merger.  There was no such vote and none was required
under Delaware law.  The Defendants' assertions that there were deficiencies in
the merger notice speak to whether the Defendants had the information they
required to make a decision between the $0.01 per share offered by the Debtors,
and the fair value of the shares to which the Defendants' are entitled under the
Delaware appraisal rights statute.

**F.**    <u>Public Policy Does Not Support Subordination in This Case</u>

The Committee asserts that subordination is supported by public policy because Defendants at one time held an equity stake in the Debtors and therefore bear the risk for the complete loss of their investment, while unsecured creditors do not take such a risk.   (Motion for Summary Judgment at ¶ 35). Although it is true that the Defendants had a potential for unlimited gain and other unsecured creditors bargained for "a predetermined gain," it is also undoubtedly true that even unsecured creditors risked the complete loss of their investment. Such an outcome is not unheard of.

Furthermore, even equity holders do not take a risk that the controlling shareholder and the company's directors will violate their fiduciary duties and injure the equity holders.   "Equity holders do not have a reasonable expectation of becoming the victims of an independent intervening tort merely because they are equity-holders." <u>In re Audre, Inc.</u>, 210 B.R. at 369.  <u>See also</u> <u>In re Angeles Corp.</u>, 177 B.R. 920, 928 (Bankr. C.D. Cal. 1995) <u>aff'd</u>, 199 B.R. 220 (B.A.P. 9th Cir. 1996).   So the tort risk, which the Committee thinks justifies subordinating the Defendants, is actually a risk borne by the equity holder and creditors of the Debtors.   This, in fact, was Congress' intent.

> 510(b) reveals a Congressional desire to shift to the shareholders the risk of fraud <u>in the issuance and sale of a security</u>-no more. The legislative history expressly focuses on the initial illegality and thus the automatic subordination required by section 510(b) should extend no farther.

<u>Id</u>. at 609-610; <u>In re Audre, Inc.</u>, 210 B.R. at 369 (emphasis added)

Further indication of Congress' intent comes from <u>SeaQuest</u> itself.

Congress anticipated that claims falling within the rescission category [of § 510(b)] would typically involve claimants who seek rescission by the court <u>as a remedy for securities fraud</u>. See, e.g., In re Wyeth Co., 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991) ("[Congress's] concern was that an equity holder could elevate his claim to that of an unsecured creditor through a claim for rescission of his purchase of the debtor's securities or a tort claim for damages arising out of his purchase of the debtor's securities."). When it enacted § 510(b), Congress was primarily focused on rescission claims <u>based on fraud in the issuance of securities</u>. See <u>Id.</u> at 921-922 ("But subordination of rescission or tort damage claims arising out of an illegal stock transaction keeps the risk where it belongs, i.e., upon the shoulders of the equity purchaser").

<u>In re Seaquest Diving, LP</u>, 579 F.3d at 419 (emphasis added).  According to the <u>SeaQuest</u> court, Congress enacted § 510(b) out of concern that an equity holder would attempt to elevate his claim through rescission or by making a tort claim for damages that arose from his purchase of the debtor's securities.  Congress was not concerned about a situation such as the one in the case before this Court, where an equity holder, through no fault or choice of its own, has its shares taken by the debtor.  There is no risk, in that situation, that the equity holder will rig such a scenario in order to elevate his claims.

Ultimately, however, this discussion is academic because the Defendants' claims plainly did not arise from the sale of a DMT security.  Therefore, the claims should not be subordinated and the Motion for Summary Judgment should be denied.

## Conclusion

For all the reasons discussed above, the Defendants respectfully request the Court deny the Committee's Motion for Summary Judgment.

Dated:   May 24, 2010

Respectfully submitted,

PADUANO & WEINTRAUB LLP

By: /s/ Anthony Paduano
       Anthony Paduano

1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100
ap@pwlawyers.com

JASPAN SCHLESINGER LLP
Lisa M. Golden (LMG-2148)
300 Garden City Plaza
Garden City, New York 11530
(516) 746-8000
Fax: (516) 393-8282

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 24, 2010, a true and correct copy of the foregoing document was served on all parties by electronic means as listed on the court's ECF noticing system.


    /s/ Jason Snyder_____
            Jason Snyder