IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

FLI DEEP MARINE LLC, BRESSNER PARTNERS LTD.,
LOGAN LANGBERG and HARLEY LANGBERG,                              :

               Plaintiffs,                              :


  -against-                              :  Civil Action No.

                                                         <u>VERIFIED COMPLAINT</u>
                                                   :

PAUL MCKIM, B.J. THOMAS, DANIEL ERICKSON,
FRANCIS WADE ABADIE, OTTO CANDIES, JR., OTTO
CANDIES, III, EUGENE DePALMA, LARRY LENIG, JOHN        :
ELLINGBOE, BRUCE GILMAN, JOHN HUDGENS,
NASSER KAZEMINY, DCC VENTURES, LLC,
NJK HOLDINGS CORPORATION, NKOC, INC.,                              :
OTTO CANDIES, LLC, DEEP MARINE HOLDINGS, INC.,
and DEEP MARINE TECHNOLOGY, INC.

                                                    :

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

As and for their complaint, Plaintiffs allege:

## **NATURE OF THE ACTION**

1.    This action is filed by the victims of a conspiracy to loot Deep

Marine Holdings, Inc. ("Deep Marine Holdings") and its subsidiaries, including its wholly

owned subsidiary, Deep Marine Technology, Inc. ("Deep Marine Technology," and

together with Deep Marine Holdings, "DMT").  Plaintiffs originally purchased shares of

Deep Marine Technology commencing in early 2002.  On March 27, 2008, all shares in

Deep Marine Technology were exchanged for shares of Deep Marine Holdings, the

parent of Deep Marine Technology (the "Exchange") at a rate of 380 shares of Deep

Marine Holdings stock for each share of Deep Marine Technology stock.  For ease of reference, we refer to shareholders as owning shares of "DMT," both before and after the Exchange.

2.     Plaintiffs, former minority shareholders of DMT, are the victims of a conspiracy to loot DMT for the private benefit of the Defendants, the majority shareholders and current and former corporate officers and directors of DMT. Defendants have corrupted and destroyed a Delaware corporation -- valued only months ago at more than $100 million and according to Defendants, worth nothing today.  Worse, Defendants have misused the Chancery Court in order to delay and distract Plaintiffs while Defendants organized their plan to squeeze Plaintiffs out of DMT altogether and pay them and other minority shareholders virtually nothing – only $22,000 in total – for their interests.  Along the way to purposely ruining DMT and Plaintiffs' entire investment in it, the Officer and Director Defendants and Controlling Shareholder Defendants (each as defined below) allowed Defendant Nasser Kazeminy – who had referred to himself as the "controlling shareholder" of DMT and did in fact control the operations and strategy of the company – to use DMT to funnel improper secret payments to the wife of his friend, then-Senator Norman Coleman of Minnesota. The Officer and Director Defendants and Controlling Shareholder Defendants also helped Otto Candies, Jr., along with his affiliated entities and son, to drive the company's value into the ground with self-dealing transactions that cost DMT millions of dollars in damages and lost revenue opportunities and diluted the equity of Plaintiffs and other minority shareholders in DMT for the benefit of the "Controlling Shareholders".

3.     When Plaintiffs first learned the extent of Defendants' wrongdoing and corporate looting, in October 2008 – at a point when DMT was worth $100 million or more – they immediately notified the DMT Board of Directors (the "Board").  Unwilling to risk exposure of any of DMT's internal workings, Defendants took an aggressive position immediately.  They reduced the DMT Board to just two people – Defendants CEO Bruce Gilman and director Larry Lenig, both of whom were and are controlled by the majority shareholders Kazeminy and Otto Candies.  Then, Mr. Gilman and Mr. Lenig formed a purported "Special Committee" to "investigate" Plaintiffs' allegations of wrongdoing by appointing themselves – not independent directors – to the "Special Committee."  When the Board refused to take any real remedial action, in November 2008, Plaintiffs commenced a derivative action in this Court.[1]  On the basis of the Special Committee's explicit representations to the Court that it needed several months to "investigate" Plaintiffs' allegations, the Court dismissed Plaintiffs' derivative action without prejudice, so that the Special Committee could complete its investigation.

4.     Shielded from any discovery and ignoring all of Plaintiffs' requests for information about the "investigation" or what was happening to the company financially, Defendants continued to use DMT for their own nefarious purposes.  Somehow during this period, the Defendants dissipated or conveyed more than $100 million in value of DMT and turned the company into a worthless shell.

5.     After more than eight months from its supposed formation, on June 30, 2009 the Special Committee released a press statement declaring it had found no

---

[1] A copy of the Complaint filed in Plaintiffs' derivative action is attached hereto as Exhibit A.

wrongdoing in the course of its "investigation."  The company flatly refused to send or even show its report to anyone, including Plaintiffs.  The <u>very next day</u>, as part of a scheme to rob Plaintiffs of their DMT shares and their standing to re-file their derivative action, DMT commenced and concluded a Delaware Section 253 short-form merger without notice to or consent of Plaintiffs, pursuant to which Plaintiffs were squeezed out as shareholders of DMT.  On July 11, 2009 Defendants sent Plaintiffs a notice of merger and offered them <u>one cent</u> per share for their DMT shares.  Defendants' merger notice, which is materially deficient, includes an "appraisal" of DMT purportedly showing that the company is now so bereft of assets and laden with debt as to be worth nothing at all.  The merger compensation totals $22,000 for <u>all</u> minority shares of DMT.

6.      According to a Confidential Source, DMT has sold, or is in the process of selling, four of its boats – the majority of its assets – and has terminated the employment of all but a handful of employees.  On information and belief, DMT is planning to wind down its operations and liquidate, at least in part in order to avoid its obligations to the Plaintiffs.

7.      Either intentionally, or through gross negligence and mismanagement, the officers and directors of DMT have aided and/or allowed DMT's Controlling Shareholders -- Defendants Mr. Kazeminy and Otto Candies (collectively, the "Controlling Shareholders") and entities or persons within their control or acting at their direction -- to exploit and loot the corporation for their own economic benefit and/or improper purposes.

8.      By virtue of Defendants' purposefully nefarious actions as detailed below, Plaintiffs' entire investment in DMT has been virtually wiped out[2], along with any ability to share in the future profits and value of DMT, after their instrumental financial role in developing DMT from a start-up to a $100 million company.

9.      Plaintiffs are legitimate investors tangling with barracudas.  Thanks to Defendants' perversion of the special committee process, plaintiffs have watched their investment disappear while standing by helpless to prevent it.  Plaintiffs need immediate relief to secure whatever assets are left at DMT – including any consideration received by DMT or the Defendants in exchange for any DMT assets that have been or will be sold – and to discover what happened to the company they helped develop, so that any ultimate judgment will not be against an empty shell.  Equity requires no less.

## THE PARTIES

**The Plaintiffs**

10.     Plaintiffs FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg and Harley Langberg were, until the consummation of the short form merger of NKOC and Deep Marine Holdings on July 1, 2009 (the "Merger"), minority shareholders in DMT.  Plaintiffs were early investors in DMT, having been solicited by founder and then-CEO Defendant Paul McKim to provide a portion of the original capital to DMT.

---

[2] Plaintiffs dispute Defendants' valuation of the value of DMT, but according to Defendants' valuation, Plaintiffs' entire stake in DMH has been virtually wiped out.

11.     Together, Plaintiffs owned 1,026,380 shares of Deep Marine Holdings common stock at all relevant times hereto, until the consummation of the Merger.   Upon information and belief, in 2006 Plaintiffs' shares of common stock represented more than 8.5% of the outstanding common stock of DMT.   Estimation of Plaintiffs' percentage ownership of DMT at any particular time is impossible due to the lack of company disclosures, and the self-dealing dilutive transactions by the controlling shareholders, as discussed in further detail below.   Plaintiffs alone have invested approximately $1.73 million in DMT, yet according to the Notice of Merger sent by DMT, the total value of all the equity owned by minority investors – including but not limited to Plaintiffs – is only approximately $22,000.

**The Corporate Defendants**

12.     On information and belief, Deep Marine Holdings is a Delaware corporation, with its principal offices located at 20411 Imperial Valley Drive, Houston, Texas, 77073.

13.     On information and belief, Deep Marine Technology, a Texas corporation, also has its principal offices located at 20411 Imperial Valley Drive, Houston, Texas, 77073.

14.     With the help of Plaintiffs' investments, DMT was established by Paul McKim in or about 2002.   DMT provides comprehensive subsea services to the offshore oil and gas industries, with a significant presence in the Gulf of Mexico.   On information and belief, DMT grew from approximately $2.4 million in net sales in fiscal year 2004 to approximately $81.6 million in net sales in fiscal year 2009.

15.     DMT is and has been dominated and controlled by DMT shareholders Defendants Nasser Kazeminy and Otto Candies, Jr. and their affiliates Defendants NJK Holdings Corporation, DCC Ventures, LLC, Otto Candies, LLC and Otto Candies, III, who collectively owned more than 90% of DMT's shares immediately prior to the Merger and now, on information and belief, purport to own 100% of DMT's shares as a result of the Merger.

16.     On information and belief, NKOC was a Delaware corporation that merged with and into Deep Marine Holdings on July 1, 2009, with Deep Marine Holdings as the surviving corporation.  On information and belief, NKOC was formed for the express purpose of carrying out the Controlling Shareholders' scheme to squeeze out DMT's minority shareholders, and the separate corporate existence of NKOC ceased as of the date of the Merger.

**The Officer and Director Defendants**

17.     According to DMT, Defendant Paul McKim – the founder of DMT – was a member of the Board of Directors[3] of DMT and Chief Executive Officer of DMT until he was ousted by the Controlling Shareholders in 2008.  Mr. McKim's departure left DMT without any senior management knowledgeable about its business, which has led to a loss of business and market share for DMT.

---

[3] Mr. McKim also may have served as Chairman of the Board of DMT.  A September 8, 2008 press release stated that Mr. Gilman has served as Chairman of the Board of DMT for several years; however, a DMT memorandum from Mr. Kazeminy to all DMT employees stated in July 2008 that Mr. McKim had been promoted to the position of Chairman of the Board.  (Compare Exhibit E attached to Exhibit A hereto with Exhibit F attached to Exhibit A hereto.)  Plaintiffs have not been informed of all corporate maneuvers or been given access to corporate books and records.

18.     According to testimony given at his deposition, Defendant B.J. Thomas was Chief Financial Officer of DMT until December 14, 2007 and was forced to resign from DMT effective March 14, 2008.  Mr. Thomas was told that he needed to resign because of a 1997 filing with the New York State Securities Commission in which the disclosure was not completely accurate, but on information and belief, Mr. Thomas was forced to resign in part because of his reticence to funnel money to Senator Norm Coleman through an insurance company on behalf of Mr. Kazeminy, as further discussed below. (See p. 10 of the deposition of Mr. Thomas, an excerpt of which is attached hereto as Exhibit B)

19.     According to DMT, Defendant Daniel Erickson was until mid-October 2008 a member of the Board of Directors of DMT.  On information and belief Mr. Erickson is employed by NJK Holdings Corporation and provides services to DMT pursuant to the Oversight Services Agreement between DMT and NJK Holdings Corporation, as further described below.

20.     According to DMT, Defendant Francis Wade Abadie was until mid-October 2008 a member of the Board of Directors of DMT and is also an officer of DMT.

21.     According to DMT, Defendant Otto Candies, III was until mid-October 2008 a member of the Board of Directors of DMT.

22.     According to DMT, Defendant Eugene DePalma was until mid-October 2008 a member of the Board of Directors of DMT.

23.     According to DMT, Defendant John Ellingboe was until mid-October 2008 a member of the Board of Directors of DMT.  On information and belief Mr.

Ellingboe was employed by NJK Holdings Corporation until he departed due to a dispute with Mr. Kazeminy and Otto Candies regarding the disclosure of DMT's valuation in connection with a self-dealing transaction between DMT and Otto Candies, LLC. Until his departure from NJK Holdings Corporation, Mr. Ellingboe provided services to DMT pursuant to the Oversight Services Agreement between DMT and NJK Holdings Corporation, as further described below.

24.    According to DMT, Defendant Larry Lenig is a member of the Board of Directors of DMT and, along with Mr. Gilman, one of the two members of DMT's "Special Committee." On information and belief, Mr. Lenig works for ComVest, a company that manages property and investments for Mr. Kazeminy, and is a long-term business associate of Mr. Kazeminy.

25.    According to DMT, Defendant Bruce Gilman is a member of the Board of Directors of DMT and interim CEO of DMT and, along with Mr. Lenig, one of the two members of DMT's "Special Committee." On certain DMT documents, Defendant Gilman is listed as the Chairman of the Board.

26.    According to DMT, Defendant John Hudgens is the Chief Financial Officer of DMT.

27.    Together, Defendants McKim, Thomas, Erickson, Abadie, Candies III, DePalma, Lenig, Gilman, Ellingboe and Hudgens are referred to herein as the "Officer and Director Defendants."

**The Controlling Shareholder Defendants**

28.     On information and belief, Defendant Nasser Kazeminy, together with entities he owns or controls, is a controlling shareholder of DMT.  Mr. Kazeminy controls the operations of DMT pursuant to his majority equity stake in DMT and the terms of the Oversight Services Agreement (as described in further detail below) between DMT and NJK Holdings Corporation, a company also owned and controlled by Mr. Kazeminy.  Mr. Kazeminy refers to himself as the "Controlling Shareholder" in DMT.

29.     On information and belief, Mr. Otto Candies, Jr. ("Candies Jr.") is Chairman of the Board and Chief Executive Officer of Defendant Otto Candies, LLC and, together with Otto Candies, III, owns and controls Otto Candies, LLC.   On information and belief, Defendant Otto Candies, Jr. and entities he controls are controlling shareholders of DMT.

30.     On information and belief, Otto Candies, LLC, ("Otto Candies") a Louisiana corporation, is a marine transportation company with its principal offices located at 17271 Hwy. 90, Des Allemandes, Louisiana, 70030-0025.

31.     On information and belief, Mr. Otto Candies, III ("Candies III") is Secretary of Defendant Otto Candies, LLC and has previously been a member of DMT's Board.  Together with Otto Candies, Jr., he owns and controls Otto Candies, LLC.

32.     On information and belief, Defendant NJK Holdings Corporation ("NJK Holdings") is a Minnesota corporation, owned and/or controlled by Defendant Nasser Kazeminy, with its principal offices located at 8500 Normandale Lake Boulevard

#600, Minneapolis, Minnesota, 55437.  On information and belief, NJK Holdings was a shareholder of DMT prior to the contribution of its shares to NKOC.

33.    NJK Holdings and DMT are party to an Oversight Services Agreement (the "OSA"), entered into on June 12, 2006.  Pursuant to the OSA, NJK Holdings provides "advisory, consulting and other services (the "Oversight Services") in relation to the day-to-day operations of the Company, strategic planning, domestic and international marketing and financial oversight and including, without limitation, advisory and consulting services in relation to the selection, retention and supervision of independent auditors, the selection, retention and supervision of outside legal counsel, and the selection, retention and supervision of investment bankers or other financial advisors or consultants."  In a nutshell, NJK Holdings has complete control over the "management of the affairs of the Company."  Despite the OSA giving NJK Holdings total control over DMT, Plaintiffs were never notified of the existence of the OSA or of Kazeminy's control of DMT.   A copy of the OSA is attached hereto as Exhibit C.

34.    As compensation under the OSA, NJK Holdings receives 0.5% of DMT's revenues.  Based on fiscal year 2009 revenues of $81.6 million, NJK Holdings would presumably have received $408,000 pursuant to the OSA in 2009, at the same time as DMT's value declined – in the opinion of DMT's management and controlling shareholders – from $100 million to nothing and Plaintiffs were offered one cent per DMT share they owned immediately prior to the Merger.   NJK Holdings is also indemnified by DMT for any "losses, costs, expenses, claims, damages and liabilities" to the extent that they relate to the OSA or the services provided thereunder.

35.     The OSA terminates only at such time as NJK Holdings or one or more of its affiliates control, in the aggregate, less than 20% of the fully diluted voting equity of DMT.

36.     On information and belief, Defendant DCC Ventures, LLC ("DCC Ventures") is a private investment company owned or controlled by Defendant Kazeminy.   On information and belief DCC Ventures is a Nevada limited liability company.  On information and belief, DCC Ventures was a shareholder of DMT prior to the contribution of its shares to NKOC.

37.     On information and belief, at all times relevant hereto, Defendants Kazeminy, Candies Jr., Candies III, NJK Holdings, DCC Ventures and Otto Candies dominated and controlled the ownership, operation and strategy of the company and used it for their own personal financial gain. Further, on information and belief, Defendants Kazeminy, Candies Jr., Candies III, NJK Holdings, DCC Ventures and Otto Candies directed and caused the Officer and Director Defendants to ignore corporate formalities and reasonable business practices. On information and belief, the wrongdoing complained of herein was undertaken purely for the economic benefit of the Defendants Kazeminy, Candies Jr., Candies III, NJK Holdings, DCC Ventures and Otto Candies, the Officer and Director Defendants, and that of their various friends and allies.

38.     Defendants Kazeminy, NJK Holdings, DCC Ventures, and Otto Candies, who collectively owned more than 90% of the outstanding equity of DMT

immediately prior to the Merger and controlled the operations and management of the company, are referred to herein as the "Controlling Shareholder Defendants."

### GROSS MISUSE OF CORPORATE FUNDS AT DEFENDANT KAZEMINY'S DIRECTION FOR IMPROPER PAYMENTS TO SENATOR NORMAN COLEMAN'S WIFE

39.     By reason of their positions as officers and directors, and their ability to control the business and corporate affairs of DMT, the Officer and Director Defendants and the Controlling Shareholder Defendants each owed DMT and its stockholders the fiduciary obligations of good faith, loyalty and due care.  The Officer and Director Defendants and Controlling Shareholder Defendants were required to use their utmost ability to control and manage DMT in a fair, just, honest and equitable manner.

40.     To discharge those duties, the Officer and Director Defendants and Controlling Shareholder Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of DMT.  The Officer and Director Defendants and Controlling Shareholder Defendants were required to protect the interests of the shareholders and not act to the detriment of the company and its shareholders, or to favor one group of shareholders – even majority shareholders – over other shareholders.  The Officer and Director Defendants and Controlling Shareholder Defendants are not able to avoid such fiduciary duties by "outsourcing" the management of DMT to Nasser Kazeminy and NJK Holdings under the OSA.

41.     Plaintiffs have been informed by a Confidential Source that in or about April 2007, Mr. Kazeminy, a well-known patron of Senator Norman Coleman of Mr. Kazeminy's home state of Minnesota, instructed Mr. McKim, then DMT's Chief Executive Officer, to have DMT send quarterly payments of $25,000 to Senator Coleman.   Mr. Kazeminy stated: "We have to get some money to former Senator Coleman" because the Senator "needs the money."   According to testimony given by each of Mr. Thomas and Mr. McKim in recent depositions, Mr. Kazeminy told Mr. Thomas that the reason Mr. Coleman needs the money is that "United States Senators don't make shit." (See p. 70 of the deposition of Mr. McKim, attached hereto as Exhibit D, and Exhibit B, p. 194)

42.     News articles have reported that Mr. Kazeminy was a large donor to former Senator Coleman's campaign and that the two men have vacationed together in various locations around the world at Mr. Kazeminy's expense using Mr. Kazeminy's private plane in 2004 and 2005.  Mr. Coleman has referred to Mr. Kazeminy as "a friend with a plane." (Exhibits E, F and G)

43.     News articles have reported that Mr. Kazeminy may have paid large bills for clothing purchases at Neiman Marcus in Minneapolis by then-Senator Coleman and his wife. (Exhibits E and F)

44.     News articles have also reported that when former Senator Coleman was mayor of St. Paul, the city gave a $425,000 loan to help renovate the privately held St. Paul Athletic Club.  Mr. Kazeminy was an investor in that project and

benefited directly from the city's loan, and, when the new gym opened, Mr. Coleman was the first member. (Exhibits G and H)

45.    News articles have also reported that between his jobs as mayor of St. Paul and U.S. Senator from Minnesota, Mr. Coleman worked for the law firm of Winthrop and Weinstine, the law firm that regularly represents Mr. Kazeminy. Notwithstanding the fact that it was Mr. Coleman's first job in the private sector since his graduation from law school, Mr. Coleman was apparently paid $140,000 by Winthrop and Weinstine even though his license to practice law was suspended at the time. (Exhibit H)

46.    According to the Confidential Source, both Mr. McKim and Mr. Thomas advised Mr. Kazeminy that payments by DMT to Senator Coleman would be improper.   On information and belief, at that time both Mr. Thomas and Mr. McKim refused to make such payments for DMT.

47.    On information and belief, Mr. Kazeminy then attempted to funnel the payments to Senator Coleman through Hays Companies ("Hayes"), an insurance agency in Minneapolis, Minnesota that "employs" Laurie Coleman, the wife of former Senator Coleman. (Exhibit D, p. 70).   According to Mr. McKim's deposition testimony, Kazeminy directed that DMT make payments of $25,000 to Hays.

48.    According to the Confidential Source, DMT conducts no business in Minnesota, where Hays is located. According to the Confidential Source, DMT's insurance needs had been met through Aon, a leading global insurance brokerage with experience in marine insurance. According to the Confidential Source, no person in

15

management ever suggested that any problem existed with the services provided by Aon and no person in management ever identified a problem or shortcoming with the company's insurance coverage or programs.

49.    According to news reports, Ms. Coleman, a former model and aspiring actress, received her insurance license in 2006 and was immediately employed by Hays.  (Exhibits E and I)  In a statement put out by Hays on October 31, 2008 in connection with the derivative lawsuit initially filed in connection with the facts alleged herein, Ms. Coleman was identified as an "Independent Contractor for Hays Companies since 2006."  However, on Mr. Coleman's Senate disclosure forms for 2006 and 2007, he indicated that his wife earned a salary from Hays[4], which by definition means that she was an employee of Hays, not an "independent contractor."

50.    In May 2007, pursuant to Mr. Kazeminy's instructions, DMT paid $25,000 to Hays purportedly for payment of "service fees" to an insurance broker.

51.    At Mr. Kazeminy's insistence, DMT made two subsequent payments to Hays in September 2007, each totaling $25,000.

52.    On information and belief, those three payments of $25,000 each made their way to Senator Coleman.

53.    Invoices dated September 4, 2007 and December 3, 2007 from Hays addressed to Deep Marine Technology, Inc. each show a charge of $25,000 for "quarterly installment of service fee."  (Those invoices are attached as Exhibit A to Exhibit A hereto.)

---

[4] On information and belief, while the United States Senate requires disclosure of a Senator's spouse's employment, it does not require disclosure of the actual salary earned.

16

54.     The record for "Hays" from DMT's Vendor Trial Balance database indicates that DMT received four invoices from Hays, each for $25,000, dated May 16, 2007, June 1, 2007, September 4, 2007 and December 3, 2007.   That record also reflects four DMT checks, each for $25,000, made payable to Hays, dated May 16, 2007, September 10, 2007, September 14, 2007 and November 26, 2007.  The fourth check may not have been cashed.  (That record is attached as <u>Exhibit B</u> to <u>Exhibit A</u> hereto.)

55.     According to the Confidential Source, there was no valid business reason for a payment to Hays of any amount.  According to the Confidential Source, Hays provided no services of any type to DMT – consulting services or other – and all the company's insurance was already in place, proper, and appropriate, both prior to and during the time the payments to Hays were made.  In fact, in his deposition Mr. McKim testified that "Hays knew nothing about marine insurance, about insuring divers, about the process, even where to go to look for this type of business, marine business." (<u>Exhibit D</u>, p. 66)  In his deposition testimony, Mr. Thomas also asserted that he was not aware of any services provided to DMT by Hays.  (<u>Exhibit B</u>, p. 192)  Furthermore, on information and belief, Hays has never been licensed to broker insurance by the State of Texas, where DMT's operations are headquartered.

56.     Indeed, representatives of DMT's "Special Committee" admitted in a May 2009 interview of representatives of FLI Deep Marine that DMT received no services from Hays in exchange for the $75,000 in payments.

57.     On October 15, 2008, after Plaintiffs had sent a letter to DMT's Board demanding an investigation of – among other things – the payments to Hays, Robert Weinstine, Esq. of Winthrop & Weinstine, P.A., counsel for NJK Holdings Corporation, called Plaintiffs' counsel and threatened to sue her personally for making defamatory statements in the demand letter.  In the course of making his threats, Mr. Weinstine stated that Ms. Coleman was an employee of Hays and that the payments from DMT to Hays were for an insurance policy on which Hays was a "co-broker."  The assertion that Hays was a "co-broker" of DMT's insurance policy is clearly false, contradicted by (i) the invoices Hays sent to DMT (and which DMT paid), (ii) the assertion by the Confidential Source that Hays provided no services or insurance to DMT and that all of DMT's insurance needs were met by Aon, its insurance broker, and (iii) the fact that, on information and belief, Hays was not even licensed to broker insurance by the State of Texas, where DMT's operations are located.

58.     Despite Plaintiffs' repeated requests for copies of the co-brokerage agreement with Hays and the insurance policy on which Hays was purportedly the co-broker, such copies were never produced.  On information and belief, the Special Committee did not seriously investigate Plaintiffs' allegations of the discrepancies described above, and in fact Defendants changed their story from Hays being a "co-broker" to Hays providing "consulting services" to DMT, only after the documentary evidence – the invoices from Hays and the Vendor Trial Balance entries – came to light.

59.     On information and belief, documentary evidence indicates that DMT, through its officers, falsified documents in order to make the payments to Hays appear to be legitimate corporate expenses.

60.     According to the Confidential Source, in 2008, DMT's new Chief Financial Officer, Defendant John Hudgens, who was hired to replace B.J. Thomas, instructed his controller to delete references to the Hays invoices from DMT's records, in an apparent effort to cover up evidence of DMT's payments to Hays.  DMT's record for Aged AP-Past Due-Summary reflects a past due balance of $25,000 owed to Hays. The Hays line is circled and underneath it a handwritten note provides: "Please pull this detail and delete per John Hudgens. AMC 8/19/08."  Another handwritten note states: "Debit Adj. per John."  (That record is attached as Exhibit C to Exhibit A hereto.)  Upon information and belief, this was done to hide the wrongdoing that Mr. Kazeminy had directed.

61.     These fraudulent and grossly improper payments cost DMT at least $75,000 and brought absolutely no value to the company.  Further, based on the facts disclosed by the Confidential Source, these payments exposed the Company to serious potential criminal and civil liability and apparently led to an FBI investigation, the results of which are not currently known.  As such, they constitute corporate waste and contributed to the decline in the value of Plaintiffs' shares in DMT.  The Officer and Director Defendants should have prevented this wrongdoing or should not have participated in it or should have reported it to appropriate authorities promptly upon learning of it.

62.     On information and belief, at Mr. Kazeminy's instruction, DMT forced then Chief Financial Officer Thomas to resign, based at least in part on his refusal to use DMT funds to pay Senator Coleman.

63.     On information and belief, also at Defendant Kazeminy's instruction, DMT forced out Mr. McKim as Chief Executive Officer and Chairman of the Board of DMT, in part based on Mr. McKim's reticence at participating in the Coleman/Hays payment scheme.  As a result of the Merger, DMT has also squeezed out Mr. McKim as a shareholder of DMT, the company he founded.

64.     Mr. McKim's ouster left DMT with no senior management knowledgeable about its business.  Predictably, this has led to a loss of business and market share for DMT.

**DMT'S IMPROPER PAYMENT TO MR. KAZEMINY'S FAMILY MEMBER**

65.     On or about August 12, 2008, DMT issued a check to Behnaz Ghaufouri, a relative of Mr. Kazeminy for $6,000, purportedly for services rendered to DMT.  The check was signed by DMT's Chief Financial Officer Mr. Hudgens.  (A copy of the cancelled check is attached as Exhibit D to Exhibit A hereto.)

66.     According to the Confidential Source, Ms. Gharfouri never worked for DMT in any capacity and never provided services of any type to DMT.  The payment made by DMT to Ms. Gharfouri served no legitimate business purpose and was in reality a gift of DMT's cash to a relative of controlling shareholder Mr. Kazeminy, at the expense of the other shareholders, including Plaintiffs.

**SELF-DEALING AND CORPORATE LOOTING BY DEFENDANT OTTO CANDIES**

67.     DMT regularly does business with Otto Candies, which supplied vessels for DMT's subsea projects.  Due to Otto Candies' control over the Officer and Director Defendants and his relationship with Mr. Kazeminy, DMT's transactions with Otto Candies have not been at arms-length, but have benefited Otto Candies at the expense of the minority shareholders.  DMT – at Mr. Kazeminy's instruction – has consistently overpaid for Otto Candies' vessels, crews, maintenance and equipment which resulted in the looting of DMT and the dilution of Plaintiffs' shares in DMT.

68.     According to the Confidential Source, during 2006, 2007 and 2008, Otto Candies repeatedly misrepresented the state of its vessels and then charged DMT hundreds of thousands of dollars to lease and charter vessels which were broken, poorly built or not able to meet US Coast Guard regulations (and which Otto Candies

knew were not able to meet Coast Guard regulations), and for which crews were promised by Otto Candies but not provided at the last minute. The Otto Candies vessels at issue were not delivered to DMT as agreed, and needed additional hundreds of thousands of dollars worth of work and many months to be ready for operation for DMT's needs. This forced DMT to pay to repair the defective vessels that Otto Candies had off-loaded onto it. In addition, DMT lost valuable contracts with its customers and millions of dollars in revenue as a result of the substantial deficiencies in the Otto Candies vessels and the time delays involved in fixing those vessels. Yet, DMT continued to pay above-market rates for substandard and broken vessels simply because Otto Candies was on both sides of the deals.

69. According to the Confidential Source, in or about May 2007, Otto Candies' and Mr. Kazeminy's undue influence on the Officer and Director Defendants caused DMT to pay (and waste) $6 million above the contracted price to purchase the vessel Emerald, simply because Candies Jr. demanded such amount at the closing of the sale transaction. This arbitrary hold-up was entirely one sided in Otto Candies' favor. DMT did not receive consideration for its payment to Otto Candies of the additional $6 million. On information and belief, similar schemes were used in connection with other transactions between DMT and Otto Candies.

70. Otto Candies was also required to supply a crew to operate the Emerald. Based on such assurances, on information and belief DMT signed a contract with BP for BP to utilize the vessel. Notwithstanding the contract with Otto Candies, DMT was forced to hire a different crew at its own expense to satisfy its obligations

under the BP contract when Otto Candies informed DMT a mere two weeks before the vessel was completed that Otto Candies would not in fact be supplying a crew for the Emerald.

71.    In 2006, Otto Candies leased the vessel Agnes to DMT for $30,000 per day, to serve as a deep diving platform for work being performed by DMT divers. On information and belief, Otto Candies represented to DMT that the Agnes would meet all requirements for certification as a diving platform by the United States Coast Guard. However once DMT received the vessel and was able to conduct its due diligence on the vessel, it was apparent that the Agnes was not even close to meeting the applicable standards for certification, according to testimony by Mr. McKim at his deposition. (Exhibit D, p. 143 – 44) On information and belief, had there been an accident, or had someone died, while diving off the Agnes, DMT and Otto Candies and various individuals employed by both companies would have faced possible criminal and civil liability and DMT would have been uninsurable and out of business.  In addition, DMT was required to put tens of thousands of dollars into the vessel to bring it up to applicable standards, and paid Otto Candies for a month that the Agnes was non-operational, sitting at dock, at a cost to DMT of approximately $900,000.

72.    In addition, according to Mr. McKim's testimony, the contract with Otto Candies for the vessel Agnes included maintenance.   But due to poor maintenance, even after the vessel met the certification standards it could not be used all of the time, costing DMT significant lost revenues.

73.     On information and belief, in or about October 2007 DMT purchased the vessels the Agnes and the Sapphire from Otto Candies.   The consideration for the purchase was $35 million in DMT stock, although according to the Confidential Source, the two vessels were worth no more than $28 million, resulting in an overpayment to Otto Candies of at least $7 million.   On information and belief, in connection with the purchase of the vessels and the issuance of DMT stock to Otto Candies, Mr. Kazeminy valued DMT at $180 million.

74.     On information and belief Defendant Ellingboe insisted that the valuation of $180 million used to calculate Otto Candies' equity in DMT be included in DMT's Board minutes.   Both Mr. Kazeminy and Otto Candies refused because, according to the Confidential Source, they did not want anyone to know the valuation of the deal with Otto Candies.   On information and belief, Defendant Ellingboe left Mr. Kazeminy's employ shortly afterward.

75.     DMT contracted with Otto Candies for, and paid $700,000 for, a new crane to be placed on one of its vessels.   Otto Candies actually delivered a used crane that was not operable.   On information and belief, Otto Candies delivered the new crane, promised to DMT, to a DMT competitor.

76.     In 2007, Otto Candies kept the Diamond, which when in service was one of DMT's largest and most profitable vessels, in dry dock for a total of five months.   The loss of the use of the Diamond cost DMT approximately $8 million in lost revenue.

77.     These transactions all involved self-dealing by Otto Candies which the Officer and Director Defendants countenanced and aided.  Otto Candies, Candies Jr. and Candies III – aided and abetted by the Officer and Director Defendants as well as Mr. Kazeminy – acted to enrich itself and themselves at the expense of the corporation and the other shareholders, including Plaintiffs.

78.     The Officer and Director Defendants failed to exercise ordinary diligence in evaluating DMT's transactions with Otto Candies and failed to use outside experts or consultants to assist them in valuing such transactions.

79.     Rather than paying Otto Candies in money, in many of the transactions DMT issued convertible debt to Otto Candies in exchange for some or all of the vessels and equipment sold or leased to DMT.  When Otto Candies eventually converted the DMT debt it held into DMT common equity, Otto Candies received more DMT shares than it would have received had DMT not overpaid for the assets.  Plaintiffs/minority shareholders were substantially diluted, at a minimum in the amount of the overpayment to Otto Candies as a result of the self-dealing transactions.

80.     These improper transactions cost DMT millions of dollars in wasted corporate assets and lost corporate opportunities, and significantly reduced the value of Plaintiffs' shares in DMT, both by reducing the value of DMT and by diluting Plaintiffs' interest in the devalued company.  Further self-dealing and improper transactions by the Controlling Shareholder Defendants will leave DMT with insufficient assets to satisfy a judgment in favor of Plaintiffs.

81.     Paul McKim testified at his April 2009 deposition that he raised the issue of the Otto Candies problems repeatedly with the other Defendants. (Exhibit D, p. 86 – 90, 201 – 12)

82.     On April 24, 2008, Defendants Gilman, Hudgens and then-CEO McKim met with Plaintiffs at FLI Deep Marine LLC's offices in New York.   At the meeting, Mr. McKim detailed the problems Candies Jr., Candies III and Otto Candies, LLC were causing DMT and the resulting extraordinary cost to the company.   Mr. Gilman remarked that it was "unprecedented" in the industry to leave a vessel in dry dock for four months when it could have been in service generating revenues for DMT.

83.     Mr. Gilman and Mr. McKim promised to raise these issues at a board meeting the next day, but Plaintiffs are not aware of any board action to remedy this problem.

84.     On information and belief, Defendants' response was instead to fire McKim and replace him as DMT's CEO with Defendant Gilman, who was complicit in the wrongdoing, in utter disregard of their fiduciary duties as well as the financial disaster that the resulting lack of leadership would cause DMT in loss of revenues and market share.

85.     These improper transactions also enabled Otto Candies (and its controlling shareholders, Candies Jr. and Candies III) and Mr. Kazeminy to gain complete control over DMT, represented by the combined stake of at least 90% of DMT's equity prior to the consummation of the Merger.   Many of the transactions between DMT and Otto Candies were paid for through the issuance of convertible notes

to Otto Candies, rather than money payments.  When Otto Candies converted the DMT notes it held into DMT common equity, Otto Candies received more DMT shares than it would have received had DMT not overpaid for the assets.   Plaintiffs/minority shareholders were substantially diluted in the amount of the overpayment to Otto Candies as a result of the self-dealing transactions.  This scheme effectively transferred value from Plaintiffs to Otto Candies in the amount of the overpayment.  The Plaintiffs, along with other minority shareholders, had their equity interests in DMT severely diluted and Otto Candies' equity stake in DMT increased to the point that immediately prior to the Merger, Otto Candies and Mr. Kazeminy controlled at least 90% of DMT's outstanding stock.

## KAZEMINY AND CANDIES HAVE RUN DMT PURELY TO PURSUE THEIR OWN INTERESTS WITHOUT REGARD TO ANY PROPER CORPORATE FORMAILITIES

86.    DMT, acting through the Officer and Director Defendants and with the knowledge and assent of the Controlling Shareholder Defendants, has consistently failed to follow Delaware or Texas corporate law requirements as to board meetings, appointment or election of directors, record-keeping and notices of actions taken by written consent.

87.    DMT's corporate filings both in the State of Texas and in the State of Delaware are inconsistent with each other as to the names and titles of the members of the beneficial owners of DMT, the members of the Board of Directors and the officers of the company.  These filings are also inconsistent with DMT memoranda from Mr. Kazeminy and material on the DMT website as to the officers and directors of DMT.

88.    For example, a September 8, 2008 press release on the DMT website states that Mr. Gilman has served as "Chairman of our Board for the last several years"; however, a July 2008 memorandum from Mr. Kazeminy to all DMT employees stated that Mr. McKim had been promoted to the position of Chairman of the Board.  (Compare Exhibit E attached to Exhibit A hereto with Exhibit F attached to Exhibit A hereto.)

89.    Prior to October 2008, Mr. Gilman, Mr. McKim, Mr. Lenig, Mr. Erickson and Mr. Ellingboe held themselves out as the directors of DMT (the "Pre-October Board").

90.    On information and belief, in early to mid-October 2008, Mr. Hudgens alone, acting for DMT, purportedly appointed Mr. Erickson, Mr. DePalma, Mr. Abadie and Mr. Candies to the DMT Board of Directors, joining Mr. Gilman and Mr. Lenig and then-CEO Mr. McKim, purportedly already on the Board of Directors.  (These seven individuals are referred to herein as the "Mid-October Board.")

91.    Plaintiffs do not believe that the Mid-October Board members were put on the Board properly.

92.    Plaintiffs learned on or about October 18, 2008 that Mr. Erickson, Mr. Abadie, Mr. Candies and Mr. DePalma of the October Board had resigned from the DMT Board of Directors.  In the interim, Mr. McKim has been forced off the board and out of the company he founded.  Thus, according to DMT, the DMT Board now consists of only Mr. Gilman and Mr. Lenig (the "Current DMT Board"), both of whom also comprised the "independent special committee" that "investigated" Plaintiffs' allegations

of wrongdoing in connection with the derivative lawsuit, even though both are under the influence of Mr. Kazeminy.

93.    Plaintiffs have never received notices pertaining to any of the elections, appointments or resignations of the various members of the Pre-October Board, the Mid-October Board or the Current DMT Board, and have only periodically and inconsistently received updates or financial disclosures from DMT.

94.    Plaintiffs believe that the Controlling Shareholder Defendants have changed the members of the Board to suit their needs depending on the situation. When the Defendants needed to be absolutely certain of the results of the "Special Committee" review, they turned to two well-controlled insiders, Defendants Gilman and Lenig.

95.    In addition, minority shareholders were not made aware of the facts concerning the OSA or the Otto Candies transactions described above, including the overpayment for assets and the related subsequent dilution of Plaintiffs' DMT equity. Minority shareholders were also not made aware of the DMT valuation used to calculate the various equity issuances to Otto Candies in the self-dealing transactions with DMT. On information and belief, at least one of those transactions valued DMT at $180 million, although Mr. Kazeminy and Otto Candies refused to disclose such valuation in DMT's Board minutes, over the insistence of Defendant Ellingboe, then a DMT board member and an officer of NJK Holding Corporation, another of Mr. Kazeminy's companies.  On information and belief, Mr. Ellingboe left Mr. Kazeminy's employ shortly after the incident.

96.     In Mr. McKim's deposition testimony, he stated that Mr. Gilman and Drew Michel, a former DMT board member, were both frustrated at the lack of corporate formalities, and that Mr. Michel resigned from DMT's board as a result.  According to Mr. McKim's testimony, Mr. Gilman and Mr. Michel "were always coming to me after a board meeting and saying, 'This is ridiculous. This is truly not a board meeting.  This is a Nasser [Kazeminy] meeting.  The board has no authority.  We can't vote.  We don't -- Nasser tells you what to vote, you know.'"  Nevertheless, Mr. Gilman never resigned from the board, nor did he ever do anything to stop Mr. Kazeminy or Otto Candies. (Exhibit D, p. 77 – 8)

97.     By consistently operating outside the rules of corporate law as to corporate governance, record-keeping and notices, the Officer and Director Defendants have breached their fiduciary and legal duties to the company and Plaintiffs and the Controlling Shareholder Defendants have breached their fiduciary duties to the Plaintiffs.

98.     As a result of such breach of duties, millions of dollars of DMT's value has been wasted, contributing to a decline in DMT's value and disproportionately reducing the value of Plaintiffs' shares because of the dilution of their equity stake.

99.     In addition, by reason of such breach of duties, Plaintiffs do not have sufficient information to decide between the Merger compensation offered by DMT and their statutory appraisal rights.  The Notice of Merger (as detailed below) is inadequate by itself, and Plaintiffs have not received over their years as DMT

shareholders the information and disclosure typically available to shareholders – even minority shareholders – of Delaware corporations.

## GROSS MISMANAGEMENT OF DMT BY DEFENDANTS

100.    The lack of legitimate corporate governance at DMT has furthered the interests of the Controlling Shareholder Defendants in running DMT according to their own agenda to the detriment of the company and the minority shareholders.

101.    At all relevant times, the Officer and Director Defendants did not act in good faith in the interests of DMT or the minority shareholders, and acted in reckless disregard of their duties as officers and directors of DMT.

102.    In December 2007, MV Diamond – one of DMT's largest and most profitable vessels – went into dry dock for Coast Guard inspection.  Even after the inspection was completed, MV Diamond inexplicably sat in dry dock for a total of five additional months.  Leaving one of the company's most valuable assets and largest revenue generators idle for five months – a highly unusual business strategy to say the least – cost DMT approximately $8 million in lost revenue and sharply reduced the market value of DMT's stock.

103.    On April 24, 2008, a meeting took place between Plaintiffs, Defendants Gilman, Hudgens and then-CEO McKim.  At the meeting, Mr. Gilman remarked that it was "unprecedented" for a vessel such as MV Diamond to sit in dry dock for four months when it could have been in service generating revenues for DMT.  Mr. McKim also went into detail regarding Otto Candies' self-dealing and looting of DMT, the first time Plaintiffs became aware of these facts.  Current CEO and later

"Special Committee" member Mr. Gilman agreed with Mr. McKim's assertions at the meeting, but subsequently did not take any remedial action.  Notwithstanding that he had agreed with Mr. McKim's assertions regarding Otto Candies' looting of the DMT, now that Mr. Gilman is apparently CEO of DMT, one of two board members of DMT, and one of two members of the "Special Committee", Mr. Gilman has incredibly concluded in the recent report issued by the "Special Committee" that there was in fact no wrongdoing on the part of Otto Candies or any of the other Defendants.

104.    As a result of the gross management of DMT, the value of DMT has fallen precipitously over the preceding two years.

105.    On information and belief, about one year ago a significant minority shareholder sold his DMT stock to Mr. Kazeminy and/or companies controlled by Mr. Kazeminy, based on an equity valuation of DMT of approximately $100 million.

106.    On information and belief, in or about August 2008, when Defendants forced Mr. McKim out of DMT – in part because of his resistance to making the Coleman/Hays payments for Mr. Kazeminy – DMT offered to buy Mr. McKim's DMT shares using a valuation of $100 million for the equity of the entire company.

107.    In August 2007, Bruce A. Siegel, Robert D. Rosenthal, and Ralph F. Palleschi, principals of Plaintiff FLI Deep Marine, had a telephone call with then-CFO Defendant Thomas in which Mr. Thomas estimated DMT's value at $100 million net of all debt.  Mr. Thomas also speculated that Mr. Kazeminy would accept $140 – 150 million for DMT.

108.   On information and belief, DMT commissioned two outside appraisals in the past two years that both valued the company at more than $100 million, net of all debt.   In addition, on information and belief, Hornbeck Offshore Services offered $120 million for DMT at some point in 2008 but Defendant Kazeminy rejected that offer as well as an offer by another potential buyer for $100 million at about the same time, because Mr. Kazeminy felt both offers were too low.

109.   In September 2007, Mr. Siegel again spoke to Mr. Thomas on the telephone.   Mr. Thomas indicated to Mr. Siegel that DMT was projected to reach $90 million in revenues for that fiscal year.

110.   On July 30, 2008, Defendant Kazeminy sent a memorandum to all DMT employees (the "July 30 Memorandum") in which he bragged about DMT's "unprecedented growth," attributable to, among other things, "great founding partners such as Otto Candies."   The effusive praise for Otto Candies in the July 30 Memorandum is especially ironic considering it came just months after the April 24, 2008 meeting at which Defendants McKim and Gilman openly discussed the problems that Otto Candies was causing DMT. (See Exhibit F attached to Exhibit A hereto)

111.   Kazeminy's July 30 Memorandum also touted the "$100MM in revenues" DMT was enjoying.   The audited financial statements provided with the Notice of Merger show that for fiscal year 2008, revenues were approximately $83.2 million and for fiscal year 2009, revenues were approximately $81.6 million.   On information and belief, at no time did DMT ever have $100 million in revenues.

33

112.    Kazeminy's July 30 Memorandum also announced personnel changes at DMT, including the promotion of Defendant McKim to Chairman of the Board and Otto Candies, III to "assist to review our current cost structure, financial organization, and the company's financial processes."  In other words, as of July 2008, Mr. Candies III wore several different hats with regard to DMT – controlling shareholder, officer, and vendor of the company's most expensive and important assets – putting him on all sides of many transactions with the company.  Amazingly, at the very same time that Otto Candies and his company Otto Candies, LLC were looting DMT, his son (Mr. Candies III) was being engaged to oversee the finances of DMT.

113.    In the Notice of Merger provided to Plaintiffs by DMT, DMT now claims that it is insolvent and has offered Plaintiffs $0.01 per share as merger compensation.  According to the Notice of Merger, the entire value of DMT is now approximately $240,000 and the total value of the equity of all the minority shareholders – including but not limited to Plaintiffs – is only $22,000.

114.    Thus, less than 12-18 months ago, both insiders of DMT and outside appraisers valued DMT at $100 million or more, but now that DMT has forced the Plaintiffs out of their investment, DMT is apparently worth virtually nothing according to Mr. Kazeminy and Otto Candies.

### Plaintiffs Attempt to Expose Defendants' Wrongdoing

115.    When Plaintiffs first learned of the Hays/Coleman payments and the Otto Candies self-dealing problems, they sounded the alarm with the Board in an attempt to save DMT.  On October 10, 2008, Plaintiffs sent a shareholder demand letter

(the "Demand Letter") to the five individuals purportedly on the Pre-October Board of DMT: Defendants Gilman, Lenig, Erickson, McKim, and Ellingboe. (A copy of the Demand Letter is attached as <u>Exhibit G</u> to <u>Exhibit A</u> hereto.)   In that letter, plaintiffs demanded that the Board: A) investigate the wrongdoing alleged herein; B) take action to end all fraudulent activities; C) bring actions to recover funds wrongfully diverted from DMT and for compensatory damages; and D) establish procedures to ensure that similar wrongdoing would not occur in the future.  Plaintiffs also asked for an assurance that DMT would take steps to preserve documents and guard against destruction or spoliation of evidence.

### Defendants' Appoint a Bogus Special Committee

116.    On October 13, 2008 in response to Plaintiffs' Demand Letter, DMT stated that it had established a "Special Committee" to investigate the allegations raised in the Demand Letter.

117.    Plaintiffs learned on or about October 13, 2008 that the members of the DMT Special Committee were not independent directors, but Defendants Gilman – the company's new CEO – and Lenig, an inside director previously put on the Board by Mr. Kazeminy and whose business interests rely in large part on Mr. Kazeminy.  Neither Mr. Gilman nor Mr. Lenig had the requisite independence to serve on a Special Committee.

118.    On November 1, 2008, the Minneapolis - St. Paul Star Tribune reported that on October 31, 2008 Mr. Gilman stated that DMT is "conducting its own investigation, which was launched immediately upon our being made aware of the

allegations. ... To date, we have not found any evidence of wrongdoing." (Exhibit J) Thus, Defendant Gilman was clearly serving in two roles at once that conflicted from the first: one as CEO of DMT, anxious to reassure the press and public that his company was not involved in any wrongdoing, and the other as half of the "Special Committee" supposedly "investigating" the allegations of wrongdoing.   Though the "Special Committee" at that point in October 2008 maintained it was not done with the "investigation" it had begun only weeks before (and indeed apparently needed an additional seven months to complete), Mr. Gilman already was exonerating the Defendants and prejudging the results of the supposedly impartial "investigation."

119.    As it was clear that their demand on the Board was entirely useless, on November 3, 2008, Plaintiffs filed a derivative complaint in this court on behalf of DMT, asserting claims against the Defendants for breaches of their fiduciary duties, corporate waste, self-dealing, negligence, gross mismanagement, unjust enrichment, fraud and misappropriation.  Plaintiffs hoped they would be able to save DMT and the shareholder value that had been built up over the past seven years before Defendants completely destroyed DMT.

120.    Defendants strenuously fought Plaintiffs' discovery requests in the derivative action, arguing that the Special Committee would be distracted from its important mission of investigating Plaintiffs' allegations if any Defendants had to respond to any discovery requests.   The Court agreed and stayed discovery. Defendants also fought Plaintiffs' attempts to simply attend the deposition of Paul

McKim as part of a Texas proceeding.[5]  Neither would DMT or the Special Committee provide Plaintiffs with <u>any</u> information during this period concerning the Special Committee's investigation – witnesses it was interviewing, documents it was gathering and reviewing, the status of the investigation or anticipated completion date – or <u>any</u> financial information about the company, despite Plaintiffs' numerous requests and inquiries over the months.

121.   DMT's supposedly independent "Special Committee" – though not a party to the action -- led the defense of the action for all of the defendant directors and officers.  Its main argument for dismissal of the derivative action was that the Special Committee had to be allowed to investigate and determine what action DMT should take.  As the Special Committee wrote in its Opening Brief in Support of the Motion to Dismiss the Verified Complaint: "In fact, the Committee currently is investigating the allegations asserted in the Demand and will make a recommendation to the Board after the investigation is completed.  Thereafter, the Board will make a decision in connection with the allegations asserted in the Demand." (<u>Exhibit K</u>, Opening Brief at 3)[6]  Of course, the "Special Committee" was Director and CEO Bruce Gilman and Director Larry Lenig, the same two people left on DMT's Board of Directors.

---

[5]    On October 27, 2008, Paul McKim brought suit in Texas against most of the Defendants in this action bringing derivative claims on behalf of DMT and direct claims.  On information and belief, Mr. McKim voluntarily dismissed his derivative claims.

[6]    Later on in their Opening Brief, the Special Committee stated that "if the Committee recommends and the Board decides not to commence an action based upon the allegations asserted in the Demand, then, at that point in time, Plaintiffs may decide to challenge such recommendation and decision, and may commence an action asserting that the Demand was wrongfully refused."  (<u>Exhibit K</u>, Opening Brief at 8)  Of course, Plaintiffs never got that opportunity because Defendants put into motion their scheme to squeeze out the Plaintiffs as shareholders of DMT.

122.    On March 24, 2009, the Court heard oral argument on Defendants' motion to dismiss.  Again, one of the main arguments made by the Special Committee was that the Court should dismiss Plaintiffs' claims because Plaintiffs would get another chance in court once the Special Committee finished its investigation.  It now seems clear that by that point, Defendants already had hatched their scheme to squeeze Plaintiffs out of DMT altogether and thus Defendants knew that if this delay tactic worked, Plaintiffs would never get that second chance to challenge the "investigation".

123.    On information and belief, Defendants used the Special Committee process in order to buy themselves time to carry out their scheme, and to cover their tracks.

124.    According to the Confidential Source, the Special Committee did not even interview the DMT employee who had the most significant contact with the FBI during the course of the FBI's investigation of the company.

125.    On April 21, 2009, the Court dismissed Plaintiffs' derivative suit without prejudice, in order to give the Special Committee time to "to investigate and respond to the claim prior to [Plaintiffs] filing suit."

126.    Although the Special Committee had already spent six months "investigating" Plaintiffs' allegations, the committee took another two months to conduct its investigation.  On information and belief, the Special Committee (i.e. DMT's board) used that time to continue planning their scheme, whereby they would squeeze out Plaintiffs at a ridiculously low valuation.  During that time, Defendants loaded DMT up with additional debt, much of it to Otto Candies, and diverted and dissipated DMT's

assets.  Defendants also used the time to commission the Appraisal Report that later went out to the minority shareholders with the Merger Notice and reflected DMT's now purported value (net of debt) of negative $1 million.

127.   On April 22, 2009, Plaintiffs sent a letter to counsel for the Special Committee requesting information related to the "Special Committee's" investigation. No such information was forthcoming.

128.   On May 27, 2009, Plaintiffs received a letter from Mr. Gilman, in his purported capacity as Chairman of DMT.  The letter – received less than one year after Mr. Kazeminy's memorandum to employees touting DMT's "unprecedented growth" and "$100 MM in revenues" – informed Plaintiffs that DMT "is in a critical situation with regard to cash flow and liquidity."   On information and belief, this "critical situation" resulted from Defendants loading DMT up with indebtedness.

129.   Just 2 days later, on May 29, 2009, counsel for the Special Committee of DMT, conducted a telephone interview of the principals of Plaintiff FLI Deep Marine.  The interview related to the allegations in the Demand Letter, including the corporate looting by Otto Candies and Mr. Kazeminy.  In the course of the interview, counsel for the Special Committee stated that Hays had admitted that it had provided no services to DMT in exchange for the $75,000 it had been paid by DMT.  Counsel also indicated that the Special Committee was "at the very end of the process."  Of course, another month would pass before the process was actually completed.

130.   On June 30, 2009, DMT issued a press release announcing that the Special Committee had concluded its investigation of the matters covered in the

Demand Letter, and concluded that there was no wrongdoing on the part of DMT or any of the current or former officers or directors of DMT (with the possible exception of Mr. McKim), even though the Special Committee's counsel had admitted one month earlier that $75,000 in payments were made to Hays without DMT receiving any services in return, and even though one year earlier Mr. Gilman had acknowledged Otto Candies' self-dealing, looting, breaches of fiduciary duty.  (Attached hereto as Exhibit L.)

131.   Rather than providing Plaintiffs with a copy of the Special Committee's report, or giving Plaintiffs an opportunity to come before the Court as the Special Committee argued they would at the March 24 hearing, the very next day DMT and NKOC consummated their squeeze-out merger of the Plaintiffs, thereby depriving Plaintiffs of standing to continue their derivative suit.

### Defendants Squeeze Out Plaintiffs Via Short Form Merger

132.   On July 11, 2009, DMT notified Plaintiffs (the "Notice") that on July 1, 2009 Deep Marine Holdings and NKOC merged pursuant to Section 253 of the Delaware General Corporation Law and that Plaintiffs, as minority shareholders, were to be cashed out of their DMT stockholdings at a price of $0.01 per share, or approximately $22,000 for all minority shareholders, including but not limited to Plaintiffs.  Accordingly, Plaintiffs, who invested $1.73 million commencing in 2002 to help start DMT, a company which has seen tremendous success during the past seven years, will now be forced out of the company for approximately $9,380.   In the alternative, Plaintiffs have the right under Delaware law to seek the appraisal of the

value of their shares in DMT by the Court.  (The Notice and Appraisal are attached hereto as Exhibit M).

133.   The Notice is deficient as a matter of Delaware law[7], because it does not provide the minority shareholders with the requisite information for them to determine whether to accept the merger consideration offered by DMT or seek appraisal rights.

134.   The Notice does not include material information that the shareholders need in order to make their determination, such as

- the Special Committee report;

- the terms of Mr. Kazeminy's and Otto Candies' contribution of their respective DMT shares to NKOC;

- the amount spent on legal fees in connection with the Special Committee's investigation and report and the derivative lawsuits in Delaware and Texas;

- the terms of the purchase of the significant minority investor's stock by Mr. Kazeminy in 2008;

- the details of the various offers and appraisal of DMT over the last 18 months, all valuing the company at more than $100 million; and

_____

[7] It should also be noted that the Appraisal of DMT included in the Notice was done by Growth Capital Partners ("GCP").  GCP was not an independent appraiser, but rather has a history of doing business with DMT, according to recent deposition testimony of DMT's former Chief Financial Officer, Defendant B.J. Thomas. (Exhibit B, p. 85 – 6) Clearly, Defendants had every incentive to come up with the lowest possible valuation of DMT's "fair market value" and chose an appraiser they knew well.  In addition, Edward J. ("Jed") DiPaolo, a partner at GCP, was nominated in 2004 for a directorship at DMT, at Mr. Kazeminy's urging.

- the terms of the issuance of DMT convertible debt to Otto Candies, and the subsequent conversion of such DMT debt into equity, including the ratio at which Otto Candies' debt was converted to DMT equity.

135. Some of this information should be reflected in DMT's books and records, but Plaintiffs have not been permitted to view such books and records, even though they were entitled to such records and information as shareholders.

### Defendants Continue Liquidation of DMT

136. According to the Confidential Source, DMT has sold – or is in the process of selling – four or more of its boats to another party, who may or may not be affiliated with Defendants Kazeminy and/or Candies. On information and belief, DMT has already terminated the employment of all but a handful of its employees in preparation for the liquidation of the company.

### FIRST CAUSE OF ACTION
### (Claim Against DMT for Appraisal Rights)

137. Plaintiffs incorporate herein by reference paragraphs 1 through 136 of this Complaint as if set forth herein.

138. Defendant Deep Marine Holding, a Delaware corporation, is the surviving corporation in connection with the merger of NKOC with and into Deep Marine Holding, effective July 1, 2009.

139. In connection with the merger, Common Stock held by stockholders who (a) held Common Stock on July 1, 2009, (b) perfected their rights to appraisal of such Common Stock in accordance with Section 262 of the DGCL and (c) did not thereafter withdraw their demands for appraisal of such Common Stock, are entitled to

receive from DMT payment of the "fair value" of their Common Stock, as determined by the Court. (Copies of Plaintiffs' Notices of Demand for Appraisal Rights are attached hereto as Exhibit N).

140.   Plaintiff FLI Deep Marine LLC is the beneficial owner of 938,980 shares of DMT common stock.

141.   Plaintiff Bressner Partners Ltd. is the beneficial owner of 11,400 shares of DMT common stock.

142.   Plaintiff Logan Langberg is the beneficial owner of 38,000 shares of DMT common stock.

143.   Plaintiff Harley Langberg is the beneficial owner of 38,000 shares of DMT common stock.

144.   Within the time prescribed by 8 Del C. § 262, Plaintiffs caused to be delivered to DMT written demands for the appraisal of Plaintiffs' Common Stock.

145.   Plaintiffs did not have an opportunity to vote their Common Stock in favor of the Merger and have not withdrawn their demands for appraisal.

146.   Plaintiffs have, therefore, complied with the provisions of 8 Del. C. § 262 and are entitled to a determination of the value of and payment for Plaintiffs' Common Stock.

147.   Defendants have consummated the Merger, squeezing out the Plaintiff minority shareholders, apparently based on a snapshot of DMT at its lowest possible valuation.  Defendants have either (i) materially misrepresented the value of DMT or (ii) looted DMT to the point where a company that was estimated to be worth

more than $100 million 12 to 18 months ago, is today worth nothing.  In either case, the Court should reject the valuation of DMT as determined by DMT and independently determine the value of Plaintiffs' Common Stock.

148.    Given the overwhelming evidence of looting, self-dealing, and unjust enrichment, the Court should base its appraisal of DMT not just on the current fair market value of DMT, but also – in accordance with Delaware law – on the value of DMT over the last several years, taking into account the looting of DMT and the wrongful dilution of Plaintiffs' equity stake in DMT, as well as any damages due to the other unconscionable actions of Defendants.

**SECOND CAUSE OF ACTION**
**(Claim Against the Officer and Director**
**Defendants For Breaches of Their Fiduciary Duties)**

149.    Plaintiffs incorporate herein by reference paragraphs 1 through 148 of this Complaint as if set forth herein.

150.    The foregoing actions by the Officer and Director Defendants in aiding and approving DMT actions for the private purposes of the Controlling Shareholder Defendants were without merit, served no legitimate business purpose and were not in the best interests of DMT and/or its shareholders.  These actions were taken to enrich the Controlling Shareholder Defendants at great expense to DMT and its minority shareholders.

151.    By these actions, the Officer and Director Defendants breached their fiduciary duties of care, loyalty and good faith to DMT and its shareholders.

152.     As a result of the Officer and Director Defendants' breaches of their fiduciary duties, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

153.     Continued breaches of fiduciary duty by the Officer and Director Defendants will cause irreparable harm to Plaintiffs.

### THIRD CAUSE OF ACTION
**(Claim Against the Controlling Shareholder
Defendants For Breaches of Their Fiduciary Duties)**

154.     Plaintiffs incorporate herein by reference paragraphs 1 through 153 of this Complaint as if set forth herein.

155.     On information and belief, at all times relevant to this Complaint, Otto Candies and Nasser Kazeminy were controlling shareholders of DMT and controlled the operations, management, and strategy of the company through their controlling stake and the OSA.  By combining their respective equity holdings in DMT into one company, NKOC, which they then merged with and into DMT, Mr. Kazeminy and Otto Candies also formed a control group that dominated DMT, its board, and its operations.

156.     Under Delaware law, a controlling shareholder owes a fiduciary duty to the non-controlling shareholders.

157.     Otto Candies sold vessels and equipment – some of which were not seaworthy and required hundreds of thousands of dollars to repair – to DMT at inflated prices, while Otto Candies was a controlling shareholder of DMT and while Otto Candies, III was a member of DMT's board of directors.

158.   By reason of the actions described above, Otto Candies and Otto Candies, III breached their fiduciary duties to DMT by engaging in a classic case of self dealing, thereby looting DMT and its subsidiaries, unfairly diluting minority shareholder Plaintiffs, and diminishing the value of Plaintiffs' DMT stock.

159.   The foregoing actions by the Controlling Shareholder Defendants in looting DMT were without merit, served no legitimate business purpose and were not in the best interests of DMT and/or its shareholders.  These actions were taken to enrich the Controlling Shareholder Defendants at great expense to DMT and its minority shareholders.

160.   By these actions, the Controlling Shareholder Defendants breached their fiduciary duties to DMT's other shareholders, including Plaintiffs.

161.   As a result of the Controlling Shareholder Defendants' breaches of their fiduciary duties, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

162.   Continued breaches of fiduciary duty by the Controlling Shareholder Defendants will cause irreparable harm to Plaintiffs by frustrating Plaintiffs' ability to satisfy a judgment in their favor.

## FOURTH CAUSE OF ACTION
### (Claim Against the Controlling Shareholder
Defendants for Unjust Enrichment)

163.   Plaintiffs incorporate herein by reference paragraphs 1 through 162 of this Complaint as if set forth herein.

164.   As a result of the fraudulent, unfair, and unconscionable conduct of Defendants Kazeminy, NJK Holdings, Otto Candies, Candies Jr. and Candies III, each has been unjustly enriched at the expense of Plaintiffs.

165.   By reason of the actions described above, the Controlling Shareholder Defendants have been unjustly enriched with DMT's corporate assets, thereby diminishing the value of Plaintiffs' DMT stock.

## FIFTH CAUSE OF ACTION
### (Claim Against Controlling Shareholder Defendants for Aiding
and Abetting a Breach of Fiduciary Duty)

166.   Plaintiffs incorporate herein by reference paragraphs 1 through 165 of this Complaint as if set forth herein.

167.   By reason of the actions described above, the Officer and Director Defendants breached their fiduciary duties to DMT and to Plaintiffs.

168.   By reason of the actions described above, the Controlling Shareholder Defendants knowingly participated, aided and abetted the Officer and Director Defendants in their breaches of their fiduciary duties.

169.   As a result of the foregoing, Plaintiffs' equity stake in DMT has been severely diluted, the value of Plaintiffs' DMT stock has greatly diminished and Plaintiffs have been stripped of their standing as shareholders of DMT.

**SIXTH CAUSE OF ACTION**
**(Claim Against Officer and Director Defendants for Aiding**
**and Abetting a Breach of Fiduciary Duty)**

170.   Plaintiffs incorporate herein by reference paragraphs 1 through 169 of this Complaint as if set forth herein.

171.   By reason of the actions described above, the Controlling Shareholder Defendants breached their fiduciary duties to Plaintiffs.

172.   By reason of the actions described above, the Officer and Director Defendants knowingly participated, aided and abetted the Controlling Shareholder Defendants in their breaches of their fiduciary duties.

173.   As a result of the foregoing, Plaintiffs' equity stake in DMT has been severely diluted, the value of Plaintiffs' DMT stock has greatly diminished and Plaintiffs have been stripped of their standing as shareholders of DMT.

**SEVENTH CAUSE OF ACTION**
**(Claim Against Defendants For Fraud Through**
**Active Concealment of Material Facts)**

174.   Plaintiffs incorporate herein by reference paragraphs 1 through 173 of this Complaint as if set forth herein.

175.   Defendants did not consistently provide Plaintiffs with periodic or annual financial statements for DMT and prevented Plaintiffs from gaining access to relevant corporate information, including financial statements and notices relating to the election of directors.  Defendants also prevented Plaintiffs from gaining access to the Special Committee's report on Plaintiffs' allegations of fraud and mismanagement.

176.   In addition, Defendants Kazeminy and Hudgens falsified corporate records to cover up improper payments made to Hays for the benefit of then-Senator Coleman.

177.   Such active concealment of relevant facts and information has prevented Plaintiffs from gaining full knowledge of the financial health of DMT and has allowed Defendants to perpetrate their fraud unfettered by any interference from Plaintiffs.

178.   As a result of such active concealment of material information, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

**EIGHTH CAUSE OF ACTION**
**(Claim Against Defendants For Fraud Through**
**Silence in the Face of a Duty to Disclose)**

179.   Plaintiffs incorporate herein by reference paragraphs 1 through 178 of this Complaint as if set forth herein.

180.   Defendants had a fiduciary duty to fully and fairly disclose all material information in their control (i) when seeking shareholder action and (ii) in the Notice of Merger.

181.   Defendants did not disclose in the Notice of Merger all material information necessary for Plaintiffs to determine whether to accept the merger compensation offered by DMT or to seek appraisal rights.  Material information that was necessary but not disclosed includes, but is not limited to, the contents of the Special Committee's report; the terms of the significant minority investor's sale of his stock to Mr. Kazeminy in 2008; the terms of the various offers to purchase DMT over the last 18

49

months, as well as the various appraisals done on DMT over the last 18 months; the terms of the contribution of Mr. Kazeminy's and Otto Candies' shares to NKOC; and the terms of the convertible debt issued to Otto Candies as (excessive) consideration for the substandard vessels and equipment sold by Otto Candies to DMT.

182.    As a result of the Defendants' fraud through silence in the face of a duty to disclose, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

**NINTH CAUSE OF ACTION**
**(Claim Against Controlling Shareholder Defendants**
**For Wrongful Equity Dilution)**

183.    Plaintiffs incorporate herein by reference paragraphs 1 through 182 of this Complaint as if set forth herein.

184.    The Controlling Shareholder Defendants effectively exercised complete control over DMT.  The Controlling Shareholder Defendants owned – partly as a result of the wrongful equity dilution – a controlling share of DMT's equity and completely controlled the strategy and operations of DMT.

185.    The Controlling Shareholder Defendants caused DMT to issue excessive amounts of DMT stock to Otto Candies.  DMT, with the knowledge and approval of Mr. Kazeminy, overpaid for assets sold and leased to DMT by Otto Candies. In lieu of money payment for the transactions, Otto Candies received convertible debt of DMT.  When Otto Candies converted such debt into equity, Otto Candies' received a greater number of DMT shares than it would have received had DMT not overpaid for the assets, thereby wrongfully diluting Plaintiffs' equity stake in DMT.  The overpayment

for assets, and the corresponding dilution of Plaintiffs' shares, totaled millions of dollars. Otto Candies' equity stake in DMT was increased and Plaintiffs' equity stake in DMT was correspondingly diluted for the benefit of Otto Candies and as a result of his control over DMT.

### TENTH CAUSE OF ACTION
**(Claim Against Defendants Deep Marine Holdings and
Deep Marine Technology For an Accounting)**

186.    Plaintiffs incorporate herein by reference paragraphs 1 through 185 of this Complaint as if set forth herein.

187.    The self-dealing transactions between DMT and Otto Candies, the issuance of inflated convertible debt to Otto Candies which was converted to equity thereby diluting the minority shareholders, the looting of the company by Defendants Kazemeiny and the Candies, the complete lack of any corporate formalities, and the various other transactions conducted by DMT and the other Defendants without the knowledge of Plaintiffs and without subsequent disclosure to Plaintiffs have generated great complexity and obscured the true facts surrounding DMT and its shareholders.

188.    The equitable remedy of an accounting is necessary to achieve a complete settlement of the affairs of DMT and Plaintiffs, its (former) minority shareholders.

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

a) The Court determine and direct that DMT pay to Plaintiffs the fair value of their DMT Common Stock together with interest from a date 12 to 18 months prior to the Merger;

b) To the extent necessary and appropriate to a determination of the fair value of the Common Stock, the Court resolve and declare any disputed rights, privileges, or other attributes of the Common Stock;

c) Declaring that the Officer and Director Defendants and the Controlling Shareholder Defendants have breached their fiduciary duties to Plaintiffs;

d) Awarding damages to compensate Plaintiffs for the losses they have suffered caused by Defendants' actions;

e) Ordering Defendants to conduct an accounting of all funds that flowed between DMT, on the one hand, and any of Defendants, on the other hand;

f) Awarding Plaintiffs the costs and disbursements of this action, including for reasonable attorneys' fees and experts' fees;

g) Awarding Plaintiffs pre- and post-judgement interest; and

h) Such other and further relief as the Court deems just and proper.

Dated:   October 26, 2009

Respectfully submitted,

/s/ Laurie Schenker Polleck
Laurie Schenker Polleck (No. 4300)
913 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 351-8000
(302) 351-8010

PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100

*Special Counsel for Plaintiffs*