

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/19/2011

| | | |
|---|---|---|
| **IN RE:** | § | |
| **DEEP MARINE HOLDINGS, INC.,** *et al*, | § | **Case No. 09-39313** |
| Debtor(s). | § | |
| | § | **Chapter 11** |
| | § | |
| **OFFICIAL COMMITTEE OF** | § | |
| **UNSECURED CREDITORS,** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **Adversary No. 10-03116** |
| | § | |
| **FLI DEEP MARINE LLC,** *et al*, | § | |
| Defendant(s). | § | **Judge Isgur** |

<u>**MEMORANDUM OPINION GRANTING DEBTORS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

For the reasons set forth below, the Court grants Debtors' Motion for Summary

Judgment.  Accordingly, Defendants' claims are subordinated pursuant to 11 U.S.C. § 510(b).

**Background**

On December 4, 2009, Deep Marine Holdings, Inc. ("DMHI"), Deep Marine Technology

Incorporated ("DMTI"), Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC and

Deep Marine 4, LLC (collectively, the "Debtors") each filed a voluntary petition for relief under

chapter 11 of The Bankruptcy Code.

On January 19, 2010, FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg,

Harley Langberg, and Deepwork, Inc. (collectively, the "Defendants") filed Proofs of Claim nos.

99, 100, 101 and 102 (collectively, the "Claims") against one or more of the Debtors.  The

Claims asserted by Defendants, who are former minority shareholders in DMTI,[1] are each in the

---

[1] The Defendants were originally shareholders in DMTI but their shares were subsequently exchanged for shares in DMTI's parent company, DMHI.  The Court will nevertheless refer to Defendants as DMTI's shareholders for the purposes of this Memorandum Opinion.

amount of $7,500,000.00.  Each of the Claims is also based upon a pre-petition lawsuit that Defendants initiated in the Delaware Court of Chancery (the "Delaware Lawsuit").

The Defendants filed the Delaware Lawsuit on October 26, 2009.[2]  The Delaware Lawsuit alleges that DMTI's majority shareholders confiscated the Defendants DMTI shares through a short form merger with NKOC, Inc., a Delaware corporation:

> The very next day, July 1, 2009, DMT[I] announced that it had consummated a short form merger.  Under Delaware law, a shareholder vote was not required to consummate a short form merger, so without any choice in the matter or further procedure, the Defendants' shares in the Debtor were confiscated by the majority shareholders.  Defendants' only choice was whether to accept $0.01 per share—the purported "fair value" offered by the Debtors—for a company that just one year earlier had been valued at $100 million, or to seek appraisal rights for their confiscated shares under Delaware law.

Defs.' Resp. Mot. Summ. J. 5-6, ECF No. 33.  The Defendants further claim that "[t]he Defendants sought appraisal rights for their shares but the Debtors filed for bankruptcy before that process got very far."  *Id.* at 6 n.1.  "As a result, the Defendants had their shares taken but never received any compensation."  *Id.*  Through the Delaware Litigation, the Defendants sought to exercise their statutory appraisal rights for the shares "confiscated" through the short form merger.  *Id.* at 6.  The Delaware Litigation also includes additional claims "for breaches of fiduciary duties by DMT's former officers, directors, and controlling shareholders; aiding and abetting the breaches of fiduciary duty; unjust enrichment of DMT's controlling shareholders, fraud, wrongful equity dilution; and an accounting of DMT."[3]  *Id.* at 6 n.2.

---

[2] Although the Defendants in this case are the plaintiffs in the Delaware Lawsuit, the Court will refer to them as Defendants throughout this Memorandum Opinion, including when discussing the allegations raised in the Delaware Lawsuit.

[3] Each one of the Claims includes an attached document stating, in relevant part, that the "Claimant is not seeking recovery against the Debtor's estate for those claims that have been asserted against the non-debtor defendants named in the [Delaware Litigation's] Complaint for damages suffered by the Claimant as a result of the non-debtor defendants' conduct."

On January 21, 2010, the Court issued a Temporary Restraining Order (ECF No. 16) in Adversary Case No. 10-03026 which, among other things, restrained Defendants' prosecution of the Delaware Lawsuit.   The Temporary Restraining Order continues to be in effect at the issuance of this Memorandum Opinion, and the Defendants' Claims remain unliquidated.

The Official Committee of Unsecured Creditors (the "Committee") filed a Complaint for Subordination Under 11 U.S.C. § 510(b) or in the Alternative Under 11 U.S.C. § 510(c) (ECF No. 1) on March 8, 2010.   The Complaint seeks the subordination of the Defendants' Claims below those of general unsecured creditors.

The Committee filed a Motion for Summary Judgment (ECF No. 26) on April 27, 2010. The Motion for Summary Judgment seeks mandatory subordination of the Defendants' Claims under § 510(b), which provides, in relevant part:

> [A] claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).   The Committee argues that subordination is appropriate because the Defendants' Claims arise from "the purchase or sale" of the Defendants' DMTI shares.   The Committee acknowledges that at least some of Defendants' Claims involve tortious conduct not directly related to the "purchase" or "sale" of DMTI shares.   Nevertheless, the Committee argues that subordination pursuant to § 510(b) is mandatory when the claim at issue is "causally linked" to the purchase or sale of a security.   In essence, the Committee's theory construes § 510(b)'s language broadly to encompass claims that arise not only from the actual purchase or sale of a security but also from the ownership of a security.

On May 24, 2010, the Defendants filed the Opposition of Defendants FLI Deep Marine LLC, Bressner Partners, LTD., Logan Langberg and Harley Langberg to Plaintiff's Motion for Summary Judgment (ECF No. 33) (the "Defendants' Response").  The Defendants' Response contends that the short form merger did not constitute the "sale" of their DMTI shares and Defendants "therefore cannot be suing the Debtors [in the Delaware Litigation] for rescission of a sale."  Defs.' Resp. 8 (ECF No. 33).  Defendants also argue that "even if somehow shares confiscated in a short form merger could be construed to be a sale of stock, the core of Defendants' claims in the Delaware case relate to events that occurred in the years before the [m]erger."  *Id.* at 9.  Thus, "[c]ontrary to the assertions of the Committee, the entirety of the Defendants' claims do not arise from the [m]erger or any other purchase or sale of securities." *Id.*  The Defendants' Response, at its core, seeks a narrow construction of § 510(b)'s text, which includes only those claims that involve the actual purchase or sale of a security.  This narrow construction would exclude claims arising from the ownership of a security of the debtor (i.e. the post-issuance conduct of the debtor).[4]

---

[4] This point is exemplified by a footnote found in Defendants' Response:

> For most of the Committee's Motion, it appears that the Committee is asserting that the Merger was the "sale of securities" that should trigger the subordination provisions of the Bankruptcy Code.  In some places, however, it appears that the Committee is asserting that it was the *initial purchase* of DMT securities in 2002 that triggered the subordination the Committee seeks.  *See* Motion for Summary Judgment at 6 -7.  The latter assertion holds as little water as the former. The Defendants have never indicated that they seek rescission of their original 2002 investment in DMT.  Furthermore, if the Court were to adopt the Committee's argument, the logical result would be that *any* claim filed by a shareholder or former shareholder that related in any way to that shareholder's ownership of the debtor's security—even a tort that was wholly unrelated to the purchase of shares or the shares themselves but that was committed while the shareholder owned shares—would be subordinated, because if a claim was related to the shareholder's ownership of the shares, it would also necessarily relate to that shareholder's initial purchase of the shares.  This is clearly not the outcome anticipated by the *SeaQuest* court.  [*In re SeaQuest Diving, L.P.*, 579 F.3d 411 (5th Cir. 2009)].

Defs.' Resp. 9, n.4 (ECF No. 33) (emphasis original).

## Summary Judgment Standard

Summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c); *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings.[5]

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine issue of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine issue of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) ("A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party."); *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009); *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Nevertheless, a court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The Court should not weigh the

---

[5] Rule 56 was amended, effective December 1, 2007. Although most changes were stylistic, the changes to Rule 56(c) were substantive. Prior to the amendment, Rule 56(c) provided that the Court "shall" grant summary judgment if the relevant criteria were met. Effective December 1, 2007, the word "shall" was changed to "should". The Committee Notes to the 2007 amendment state that the word "[s]hould" was substituted for "shall" to recognize that, "although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56 advisory committee's notes (2007). As one commentator noted, "[E]ven when a motion for summary judgment is properly made and supported, it need not be granted. Such a motion may be granted—indeed, it should be granted—but it does not have to be granted." Bradley S. Shannon, *Should Summary Judgment Be Granted?*, 58 Am. U. L. Rev. 85, 95 (2008).

evidence inasmuch as a credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003); *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Sossamon*, 560 F.3d at 326; *U.S. v. 92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). The non-moving party has a duty to respond with specific evidence demonstrating a disputed fact issue. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *92,203.00 in United States Currency*, 537 F.3d at 507. When identifying specific evidence in the record, the non-movant must "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004); *Raga v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

If the movant does not bear the burden of proof, the movant must show the absence of sufficient evidence to support an essential element of the opposing party's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412; *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006). Movants who do not bear the ultimate burden of proof often seek summary judgment after discovery has produced insufficient evidence to support the non-moving party's claims. Upon an

adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The non-movant must "go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue" rather than relying on conclusory allegations. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163–64 (5th Cir. 2006); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Ultimately, the motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

### Issue Presented

This Motion for Summary Judgment does not involve any genuine issues of material fact. The only issue the Court must address is whether Defendants' Claims—which are based upon the causes of action maintained by Defendants in the Delaware Litigation—are "for damages arising from the purchase or sale" of a security of the debtor.[6]  Specifically, the Court must determine whether § 510(b) includes claims that arise during the course of a claimant's ownership of a security or, instead, whether § 510(b) only encompasses claims for damages incurred through the actual purchase or sale of a security.

For the reasons set forth below, the Court finds that § 510(b)'s breadth includes the causes of action alleged in the Delaware Litigation.  Accordingly, the Court grants the

---

[6] The parties also dispute whether Defendants' Claims constitute "claim[s] arising from *rescission* of a purchase or sale of a security of the debtor."  *See* 11 U.S.C. § 510(b) (emphasis added).  However, since the Committee prevails on its theory that the Defendants' Claims are "for *damages* arising from the purchase or sale" of a security of the debtor, the Court need not address the competing theories regarding § 510(b)'s rescission prong.  *See id.* (emphasis added).

Committee's Motion for Summary Judgment and subordinates the Defendants' Claims pursuant to § 510(b).[7]

## Analysis

When interpreting the meaning of a statute, courts must first look to the statutory text itself. *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004). If "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd— is to enforce it according to its terms." *Id.* If ambiguity exists, however, courts may then consult the statute's legislative history and underlying policies in order to clarify the ambiguity. *In re Telegroup, Inc., Inc.*, 281 F.3d 133, 138 (3d Cir. 2002).

### 1. Section 510(b)'s Ambiguous Language

The Court must first determine whether § 510(b)'s language "damages arising from the purchase or sale of . . . a security" is unambiguous. This inquiry requires little analysis. The Fifth Circuit has already recognized the ambiguity present in § 510(b)'s phrase "arising from." *See In re SeaQuest Diving, LP*, 579 F.3d 411, 421 (5th Cir. 2009).

In *SeaQuest*, the Fifth Circuit analyzed the meaning of § 510(b)'s "damages prong."[8] In so doing, the Fifth Circuit reviewed decisions rendered by the Second, Third, Ninth, and Tenth Circuits regarding the damages prong. *Id. at 420-421 (citing American Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2000); *Telegroup*, 281 F.3d at

---

[7] The Court's delay in ruling on the Committee's Motion for Summary Judgment is due to the Abatement Order (ECF No. 56) issued on September 7, 2010, which abated the adversary proceeding until November 18, 2010.

[8] Section 510(b)'s "damages prong" is the category in § 510(b) subordinating claims for "*damages* arising from the purchase or sale of . . . a security." *See* 11 U.S.C. § 510(b) (emphasis added). The dispute in *SeaQuest* involved § 510(b)'s "rescission prong"—which subordinates claims "arising from rescission of a purchase or sale of a security of the debtor." *Id. See also SeaQuest*, 579 F.3d at 419 ("In this case, we must determine whether § 510(b) applies when a contract is rescinded based upon the mutual agreement of the parties rather than a court-imposed remedy for securities fraud."). When interpreting the rescission prong in *SeaQuest*, the Fifth Circuit closely analyzed § 510(b)'s damages prong. *Id.* at 420. Although it is dicta, the Court finds the Fifth Circuit's damages prong analysis in *SeaQuest* to be strongly persuasive authority that provides the guidance necessary for resolution of this case.

133; *In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002); *In re Med Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006)).   All four circuit courts "agree[d] that the term 'arising from' is ambiguous and [that] resort to the legislative history is necessary."   *Id.* at 421.   *SeaQuest* implicitly adopted this conclusion[9] and this Court follows suit.

### 2.   Section 510(b)'s Legislative History and Underlying Policies

Given § 510(b)'s ambiguity, the Court must look to § 510(b)'s legislative history and the underlying policies it was enacted to effectuate.   As set forth below, the legislative history is inconclusive on § 510(b)'s scope, but the policies underlying § 510(b) support a broad construction of § 510(b) that encompasses the Defendants' Claims.

Section 510(b) is part of the Bankruptcy Reform Act of 1978, which established the Bankruptcy Code.   *Id.* at 420.   "Both the House Report on the 1978 Bankruptcy Revisions and the Report of the Commission on Bankruptcy Laws, whose proposed legislation was largely adopted by the 1978 enactment of the Bankruptcy Code, suggest that in enacting § 510(b), Congress was focusing on claims alleging fraud or other violations of securities laws in the *issuance* of the debtor's securities."   *Telegroup*, 281 F.3d at 138 (citations omitted) (emphasis added).   However, although Congress's focus was upon claims arising from the issuance of the debtor's securities, the legislative history is devoid of language limiting § 510(b)'s scope to only such claims.   *Id.* at 140 ("Although we thus agree with claimants that claims alleging illegality in the issuance of securities fall squarely within the intended scope of § 510(b), we cannot find anything in the legislative history indicating that Congress intended to *limit* the scope of § 510(b) to *only* such claims.") (emphasis original).   Instead, the legislative history leaves open the possibility for subordination of claims arising from the post-issuance conduct of a debtor.   *Id.* at

---

[9] *SeaQuest* applied the same construction of "arising from" to § 510(b)'s rescission prong that the Third Circuit— after determining that the phrase "arising from" was ambiguous and consulting legislative history—applied to the damages prong. *SeaQuest*, 579 F.3d at 422.   *See also Telegroup*, 281 F.3d at 138.

141-42 (noting that the Congressional rationale for subordinating claims arising from the issuance of securities applies equally to claims arising from post-issuance conduct of the debtor). Thus, the legislative history is ambiguous and consideration of the policies underlying § 510(b) is necessary.

The inspiration for § 510(b) is found in a 1973 article authored by Professors John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy— Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors* ("Slain & Kripke"). *Id.* ("Congress relied heavily on the Slain and Kripke article when drafting § 510(b)."). *See also Geneva Steel*, 281 F.3d at 1177 ("As the Report accompanying the House version of the bill noted, Congress generally 'adopt[ed] the Slain/Kripke position . . .'") (quoting H.R. Rep. No. 95-595, at 196 (1977)); *Betacom*, 240 F.3d at 829 ("Congress relied heavily on the analysis of two law professors in crafting the statute."); *In re Granite Partners, L.P.*, 208 B.R. 332, 336 (S.D.N.Y. 1996) ("Any discussion of § 510(b) must begin with [Slain & Kripke].").

Slain & Kripke's "subordination thesis . . . was premised upon the allocation of certain risks between investors and creditors." *SeaQuest*, 579 F.3d at 420. The first type of risk Slain & Kripke opined upon was the risk of enterprise insolvency:

> According to Professors Slain and Kripke, both investors and creditors accept the risk of enterprise insolvency but to a different degree. This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cushion for the repayment of the claim. The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected in the absolute priority rule, and should not be reallocated.

*Granite Partners*, 208 B.R. at 336.

The second kind of risk Slain & Kripke considered was the risk of illegality in the issuance of securities.  According to Slain & Kripke, this risk should be borne solely by the investors because "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors."  *SeaQuest*, 579 F.3d at 420.  *See also Telegroup*, 281 F.3d at 140 ("It is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered.") (quoting Slain & Kripke, 48 N.Y.U. L. Rev. at 288).

"While Slain and Kripke focused primarily on shareholder [claims arising from the issuance of a security], their larger concerns sprang from what they termed the 'disaffected stockholder's efforts to recapture his investment from the corporation.'"  *Geneva Steel*, 281 F.3d at 1179 (quoting Slain & Kripke, 48 N.Y.U. L. Rev. at 267).  In fact, Slain & Kripke's basic premise is that subordination should exist to "prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."  *Telegroup*, 281 F.3d at 142.  *See also Geneva Steel*, 281 F.3d at 1176 ("[Slain & Kripke] pointed out that allowing equity-holders to become effectively creditors—by treating these two classes as though they were one—gives investors the best of both worlds: a claim to the upside in the event the company prospers and participation with creditors if it fails.").

The Defendants argue that § 510(b) was nevertheless enacted solely to bar shareholders with claims arising from the actual purchase or sale of a security in the debtor from attaining the same status as general unsecured creditors.  According to the Defendants, § 510(b) is not meant

to subordinate claims arising from the ownership of a security of the debtor (i.e. claims arising from a debtor's post-issuance conduct).  Other courts have found that, given § 510(b)'s text, Defendants' theory is plausible.  *See Geneva Steel*, 281 F.3d at 1178; *Telegroup*, 281 F.3d at 141 ("Claimants' reading of § 510(b) as requiring the subordination of only those claims alleging fraud or actionable conduct in the issuance not only is plausible as a textual matter . . . but also has some appeal at an abstract level . . . .").

However, this plausibility quickly fades when one recognizes that there is no reason to use the time in which security-holders' claims arise as a basis for treating security-holders' claims differently in a bankruptcy proceeding.  *See Telegroup*, 281 F.3d at 141 (stating § 510(b) was enacted to prevent shareholders from receiving equal treatment with general unsecured creditors and there is "[n]othing in this rationale . . . [to support] distinguish[ing] those shareholder claims predicated on post-issuance conduct from those shareholder claims predicated on conduct that occurred during the issuance itself."); *Granite Partners*, 208 B.R. at 332 ("[T]here is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed.").  It is this policy rationale—"that creditors [should] stand ahead of the investors on the receiving line"—combined with the ambiguity surrounding § 510(b)'s text and legislative history, that has led courts to construe § 510(b)'s damages prong broadly to include more than claims arising from the actual purchase or sale of a security.  *See Granite Partners*, 208 B.R. at 344; *see also Betacom*, 240 F.3d at 829 ("There is nothing in the Slain and Kripke analysis to suggest that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud."); *SeaQuest*, 579 F.3d at 421 ("Congress's larger concern was the effort of disaffected

stockholders to recapture their investments from the debtors, regardless of the exact nature of their claims.").

As summarized in *SeaQuest*:

> The Second, Third, and Tenth Circuits have adopted the broad reading of the damages category adopted by the Ninth Circuit in *Betacom*.[10]   The Third Circuit has held that a claim arising from breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register stock and ensure that it is freely tradable was subject to mandatory subordination.  *See Telegroup*, 281 F.3d at 136.  The Tenth Circuit has held that a claim arising from post-issuance fraud of the debtor, which caused an investor to hold rather than sell his securities, was subject to mandatory subordination.  *See Geneva Steel*, 281 F.3 1180-81.  The Second Circuit has held that a claim arising from breach of a stock exchange provision in a termination agreement was subject to mandatory subordination.  *See In re Med Diversified, Inc.*, 461 F.3d 251, 256 (2d Cir. 2006).
> . . .
>
> For purposes of the damages category, the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract.  *See Telegroup*, 281 F.3d at 140, 142 . . . .  For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale.  *See Telegroup*, 281 F.3d at 138.  Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale.  *See id.* at 142; *Geneva Steel*, 281 F.3d at 1179.  "When an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law." *Granite Partners,* 208 B.R. at 344.  When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of a fixed return for the "upside potential of shareholder status." *Med Diversified,* 461 F.3d at 256.

---

[10] "In *Betacom*, the Ninth Circuit rejected the plaintiffs' argument that § 510(b) only applies to securities fraud claims."  *SeaQuest*, 579 F.3d at 421 (citation omitted).  "The court ultimately held that a claim arising from the debtor's failure to deliver stock pursuant to a merger agreement was subject to mandatory subordination.  *Id.* (citation omitted).

In this case, the Court finds that the Defendants' Claims are subject to mandatory subordination pursuant to § 510(b)'s damages prong.  Defendants' Claims are based on a portion of the causes of action alleged in the Delaware Litigation, including, claims for (1) the right of appraisal, (2) fraud, and (3) an accounting.[11]  These claims are causally linked to Defendants' status as DMTI's shareholders.  Given the circuit court precedent and § 510(b)'s underlying policies, the Court finds mandatory subordination is required.

## Conclusion

For the reasons set forth above, the Court grants the Committee's Motion for Summary Judgment.  A separate order consistent with the Memorandum Opinion will be issued.

SIGNED **January 19, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[11] The Delaware Litigation also includes claims against (1) the officers, directors, and majority shareholders for breaches of their fiduciary duties, (2) the officers, directors, and majority shareholders for aiding and abetting breaches of fiduciary duties, (3) the officers, directors, and majority shareholders for fraud, and (4) the controlling shareholder for unjust enrichment and wrongful equity dilution.